In the Matter of P.A. BERGNER & COMPANY, formerly doing business as P.A. Bergner & Company of Illinois, Debtor.

P.A. BERGNER & CO., Plaintiff–Appellee, Cross–Appellant,

v.

BANK ONE, MILWAUKEE, N.A., Defendant–Appellant, Cross–Appellee.

Nos. 96–3879, 96–3937.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1997.

Decided April 9, 1998.

---

Marc Beem, Michael L. Shakman, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL, Barkley Clark (argued), Mark Moedritzer, Shook, Hardy & Bacon, Kansas City, MO, Michael R. Wherry, Michael C. Runde, Davis & Kuelthau, Milwaukee, WI, Thomas G. Boyer, Russell S. Long, Milwaukee, WI, for Bank One, Milwaukee, N.A.

Douglas K. Mayer, Amy R. Wolf, David C. Bryan, Wachtell, Lipton, Rosen & Katz, New York City, Marshall Simmons, Dallas, TX, Elizabeth Warren (argued), Harvard Law School, Cambridge, MA, Charles J. Hansen, Carson Pirie Scott & Company, Milwaukee, WI, for P.A. Bergner & Company.

Before CUMMINGS, WOOD, JR., and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The proper treatment of standby letters of credit in bankruptcy proceedings is a subject of considerable complexity. In this case, P.A. Bergner & Company was the account party for standby letters of credit that Bank One Milwaukee, N.A. ("Bank One") issued in favor of two beneficiaries. Shortly before Bergner declared bankruptcy, it made certain payments to Bank One to cover the bank's own payments honoring the letters of credit. Bergner now wants to recover those payments, as either voidable preferences under section 547(b) of the Bankruptcy Code, or voidable setoffs under section 553 of the Code. See 11 U.S.C. §§ 547(b), 553. (All statutory citations not otherwise attributed are to the Bankruptcy Code, Title 11.) As a preliminary matter, we must also consider Bergner's standing to assert this action at all, as well as various defenses to its right to recover those payments. Both the bankruptcy court and the district court found in favor of Bergner, although both refused to award it

prejudgment interest. Because of the independence of each part of a letter of credit transaction, and because Bank One cannot rely on the argument that it had a perfected interest at the critical time in the funds it used to cover its payments to the beneficiaries of the letters of credit, we agree with the district court that the payments in question were voidable preferences and affirm. On Bergner's cross-appeal from the denial of prejudgment interest, we find that the denial was an abuse of discretion and remand for a determination of the appropriate amount of interest to award Bergner.

## I

Bergner (now known as Carson Pirie Scott & Co.) is the holding company for a number of large retail department stores, principally located in the Midwest. At the time the events at issue here began to unfold Bank One was Bergner's primary cash management bank. It handled Bergner's primary operating account, and it also issued standby letters of credit in substantial amounts to entities with which Bergner did business, including suppliers and insurers. Bergner did not rely primarily on Bank One for credit; instead, it maintained a revolving line of credit with a group of mostly European banks led by the Swiss Bank Corporation (collectively, "the Swiss bank group").

On July 26, 1989, Bergner and Bank One entered into a Standby Letter of Credit Agreement ("SLCA") under which Bank One agreed to issue standby letters of credit as security for some of Bergner's credit obligations. This general agreement was to govern the terms of all irrevocable standby letters of credit Bank One might issue for Bergner. Under section 1, Bergner promised to pay Bank One the amount of any draft drawn under a letter of credit issued pursuant to the SLCA "at or before presentation of the draft" by the letter's beneficiary. If an "event of default" occurred, Bergner was obligated to pay Bank One the full amount of all drafts that could be presented under outstanding letters of credit, which sum Bank One would hold without interest for the purpose of honoring such drafts. Section 6 of the SLCA gave Bank One "a security interest in and lien on any deposit account or other money now or hereafter owed [Bergner] by [Bank One]." Bergner also agreed that Bank One could, "at any time after the occurrence of an Event of Default, without prior notice or demand set off against any such accounts or other money, all or part of the unpaid balance of the Obligations." Section 12 directed that the SLCA was to be governed by the laws of the State of Wisconsin, and that letters of credit issued under it were to be interpreted according to whatever version of the Uniform Customs and Practice for Documentary Credits (UCP) published by the International Chamber of Commerce was in effect at the time of the issuance of that letter.

At Bergner's request, Bank One issued standby letters of credit, under the SLCA, to several beneficiaries, two of which are relevant to this action: one of Bergner's suppliers, Associated Merchandising Corporation ("AMC"), and Bergner's insurance company, Liberty Mutual Insurance Company. These letters, like all letters of credit, had three relevant parties—the account party, or applicant (Bergner, the bank's customer), the issuer (Bank One), and the beneficiaries (AMC and Liberty Mutual). The relationship between each pair of parties involved in a letter of credit transaction is entirely independent, although each relationship is necessary to support a letter of credit, somewhat like the three legs of a tripod. See generally John F. Dolan, *The Law of Letters of Credit: Commercial and Standby Credits* ch. 2 (rev. ed.1996).

The first leg of our tripod—the agreement between Bank One and Bergner—was a contractual relationship, represented here by the SLCA we have already described. The letters of credit themselves, which embodied the direct arrangement between the issuer (Bank One) and the beneficiaries (AMC and Liberty Mutual) were the second leg. Third, of course, Bergner had distinct obligations to the beneficiaries that the standby letters of credit were designed to secure.

Bank One's letter of credit notifying AMC that Bergner had established an irrevocable standby credit in its favor was typical. That letter specified the documents AMC would need to present in order to draw on the credit, set forth a number of special condi-

tions, and specified that the letter was subject to the 1983 version of the UCP, Int'l Chamber of Commerce Pub. No. 400. The AMC letter of credit contained a so-called "evergreen" clause, see Dolan, *The Law of Letters of Credit*, at G–12 (Glossary), under which, upon expiration, it would automatically be renewed for one year unless Bank One provided at least 60 days notice of nonrenewal. The bank also promised that if it sent such a notice, AMC would have the following right:

> [A]fter such notice is given ... funds under this Letter of Credit will also be available against a sight draft drawn on us by AMC, accompanied by a signed written statement on its letterhead stating:
>
>> "The proceeds of the accompanying draft will be held and applied against the obligations of CPS Department Stores, Carson Pirie Scott & Co. and/or P.A. Bergner & Co. of Illinois to The Associated Merchandising Corporation as they come due from time to time".

The AMC credit was first issued on July 31, 1990, for a face amount of $31,000,000. It was amended nine times to reflect increases or decreases in the amount of Bergner's outstanding orders with AMC. By July 2, 1991, the amount of the credit was $31,207,000, and the expiration date was July 31, 1991.

Between March 1989, and September 1990, Bank One also issued four letters of credit at Bergner's request to Liberty Mutual. These too were irrevocable standby letters governed by the 1983 Revision of the UCP. Taken together, their initial face amount totaled $7,097,803, but as of July 1991, they totaled $5,836,725 and were also due to expire on July 31. (There is some slight ambiguity in the record as to the total value of the Liberty Mutual letters at this later date—both the parties and we are relying on poor photocopies—but this number seems most supportable and the exact figure is irrelevant.) The letters of credit in Liberty Mutual's favor allowed for payment upon presentation of a draft attached to a signed statement that the draft was for sums payable to Liberty Mutual; they did not include the special draw-down provision included in AMC's letter.

Bergner needed standby letters of credit to provide added security for its contract to purchase merchandise from AMC and for its insurance policy with Liberty Mutual. Bank One's irrevocable standby letters of credit served that purpose. The effect of standby letters of credit like these is to put the issuer (Bank One) itself behind the account party's (Bergner's) promises to pay. As long as Bergner paid those with which it contracted, the standby letters of credit did not come into play. If, however, one of the events entitling a beneficiary to draw on a letter of credit occurred, then the beneficiary was entitled to go straight to Bank One to collect its money, without worrying about Bergner's financial health. Bank One, in turn, promised to honor a demand from either beneficiary that conformed to the letters of credit, no matter what defenses Bergner may have had against either AMC's or Liberty Mutual's request for funds. A bank is willing to make such promises to a beneficiary both because its customer—the account party to the transaction-pays it a fee for the service (approximately $300,000 annually in this case), and because the bank is in the best position to ensure that the account party will be good for the money. Sometimes the bank may simply trust a long-time customer to reimburse the bank if a beneficiary draws on a letter of credit, but very often the bank will either demand collateral or, as Bank One did here, require its customer to prepay the bank in the amount of any demand that the beneficiary may present. See generally Dolan, *The Law of Letters of Credit* ¶¶ 1.04–1.06.

On May 23 and 24, 1991, Bank One sent certified letters both to its account party, Bergner, and to the two beneficiaries of the letters of credit, AMC and Liberty Mutual, announcing that it would not renew those letters of credit. This action prompted AMC to inform Bergner that it was planning to exercise its rights, under the special condition detailed above, to draw down the full amount of the credit in its favor. Bergner passed this word along to Bank One on July 16, 1991, which prompted Bank One to ask Bergner how it planned to prefund the AMC draw. Bank One suggested one possibility— that Bergner borrow the money from Bank One itself—but Bergner rejected this on the ground that the interest rate offered was

unattractive. Bergner instead turned to the revolving line of credit it maintained with the Swiss bank group, which at that time was still approximately $74 million, believing that the interest rate would be more favorable. Bergner informed Bank One that it would make sure that it had enough money on deposit with Bank One before the AMC draw, as it was required to do under the SLCA.

On July 17, 1991, AMC presented documents to Bank One to try to draw down the full amount of the letter of credit. Those documents proved to be nonconforming, which bought the parties a brief amount of time. After correcting the technical problems with the documents, on July 19, 1991, AMC submitted conforming documents and drew $31,207,000 under the letter of credit. At 11:02 a.m. that day, the Swiss bank group wired $31,000,000 through the Federal Reserve Bank to Bergner's general operating account at Bank One (which already had enough to cover the remaining $207,000). At 1:24 p.m., Bank One began the process of transferring the funds from Bergner's operating account to AMC by "memo posting" Bergner's account in the amount of $31,207,-000. "Memo posting" is a provisional internal bank process to record the transaction pending formal posting at the end of the day. At 2:10 p.m. Bank One transferred the full $31,207,000 through the Federal Reserve Bank to AMC.

Meanwhile, Liberty Mutual was also taking action in light of Bank One's earlier notification that its letters of credit would not be renewed. On July 22, 1991, it too notified Bank One that it intended to draw down its letters unless it received a replacement letter of credit. At Bergner's request, on July 29, 1991, Bank One replaced the expiring Liberty Mutual letters of credit with a new letter of credit in the amount of $6,358,000. (The new letter allowed draws on it only after July 31, the date the four old Liberty Mutual letters were scheduled to expire, and did expire, by their own terms.) Bergner's economic problems were becoming worse, however. On July 23, 1991, Bergner had presented its revised liquidity projections to the Swiss bank group, which was not impressed. On July 29, 1991, Bergner made another draw request on its revolving Swiss bank group credit facility. The next day, the Swiss bank group told Bergner that it would not honor the July 29 request, and it declared a "material adverse change" under its credit agreement with Bergner. This action had the effect of making unavailable the approximately $43 million that remained after the July 17 draw of $31,000,000 under the facility.

On July 31, Bergner notified Bank One that the Swiss bank group had declared a "material adverse change" under its credit agreement with Bergner. Bank One considered this an "event of default" under the SLCA, and told Bergner that it would start exercising its rights under the SLCA to offset letter of credit draws against Bergner's other accounts, unless Bergner maintained sufficient funds on deposit with Bank One to collateralize the full amount of the new Liberty Mutual letter of credit. (The offsetting procedure would have meant that large numbers of Bergner's ordinary checks would have been dishonored.) Although Bergner was not able to comply with this demand instantly, after August 2, 1991, it maintained at least enough in its account to cover the new Liberty Mutual letter of credit.

These measures were not enough to stabilize Bergner's financial position. On August 23, 1991, Bergner told Bank One that it intended to file a petition under Chapter 11 of the Bankruptcy Code. This too was an event of default under the SLCA. Bank One exercised its rights under section 6 of the SLCA by taking $6,358,000 from Bergner's account and placing it in a collateral account under Bank One's control, allocating these funds for any future claims by Liberty Mutual under the outstanding letter of credit in its favor. That same day, Bergner filed its Chapter 11 petition in the bankruptcy court for the Eastern District of Wisconsin.

By June 10, 1992, Liberty Mutual had drawn down the entire amount of its letter of credit from Bank One. On August 11, 1992, Bergner (now as the Chapter 11 debtor in possession) demanded from Bank One the return of $30,007,558.79, which represented an improvement in Bank One's position for the AMC letter of credit obligation, and $5,680,475, which represented an improve-

ment in its position for the Liberty Mutual letter of credit obligation, citing § 553(b) of the Bankruptcy Code. Bank One refused, and on August 26, 1992, Bergner commenced the present adversary proceeding to recover as preferential transfers both its July 19, 1991, payment of $31,207,000 to cover AMC's letter and the August 23, 1991, attachment of Bergner's cash deposits in the amount of $6,358,000. Bergner alleged that it was entitled under 11 U.S.C. § 550 to recover these amounts for two reasons: first, the payments were preferential transfers made within 90 days of the debtor's petition for bankruptcy, see 11 U.S.C. § 547(b), and second, the trustee or the debtor in possession is entitled to recover a creditor's attempted setoff of a debt within 90 days prior to the filing of the petition, see 11 U.S.C. § 553(b). (It also argued other grounds of recovery initially, but these are not before us.) Both the bankruptcy court, *In re Bergner*, 187 B.R. 964 (Bankr.E.D.Wis.1995), and the district court (in an unpublished opinion) ruled in Bergner's favor.

## II

■ At the threshold, Bank One attacks the judgment against it by arguing that Bergner has no standing to assert the present action. Under the Bankruptcy Code, the debtor must specifically identify in its reorganization plan the claims it wishes to pursue postconfirmation. See 11 U.S.C. § 1123. Bank One argues that the plan must use "specific and unequivocal" language to accomplish this result, and that Bergner's plan failed to do so. We find this argument unpersuasive. As Bergner points out, at the time its plan was confirmed it had been prosecuting the present action against Bank One for over fourteen months. The parties had produced hundreds of documents and eighteen volumes of deposition testimony had been amassed. Discovery continued after confirmation, with not a peep from Bank One. This was undoubtedly because the plan contained the following language:

13.3. *Avoidance and Recovery Actions.*

Effective as of the date of the approval of the Disclosure Statement by the Bankruptcy Court, the Debtors waive the right to prosecute and release any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or any other causes of action, or rights to payments of claims, that belong to the Debtors or the Debtors in Possession, *other than any such actions that may be pending on such date.*

(Emphasis added.) Section 15.1(b) of the plan made it clear that the bankruptcy court retained jurisdiction to hear any such adversary proceedings that survived confirmation.

We agree with the bankruptcy court and the district court that the plan language just quoted was sufficient to preserve this proceeding for purposes of § 1123. That section allows plans to provide for:

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor ... of any such claim or interest. ...

11 U.S.C. § 1123(b)(3). The language of § 1123(b)(3)(B) is broad enough to encompass both those situations where a debtor is trying to preserve a potential future claim about which the affected party had no notice and the subset of claims that have already been filed (and are thus a matter of public record) but that remain unresolved. The Bank One action was pending as of the date of the reorganization plan, and Bank One was actively engaged in litigating it. While there might be some logic in requiring "specific and unequivocal" language to preserve claims belonging to the estate that have never been raised, the statute itself contains no such requirement. The courts that have spoken of the need for "specific" and "unequivocal" language have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individual claims must be listed specifically. *E.g., In re Harstad*, 155 B.R. 500, 510 (Bankr. D.Minn.1993) (plan must specifically state that preference actions are retained), *aff'd*, 39 F.3d 898 (8th Cir.1994); *In re Mako*, 120 B.R. 203, 209 (Bankr.E.D.Okla.1990). The language of Bergner's plan provided all the notice to which Bank One was entitled under the statute to preserve the ongoing proceeding between the parties. See, *e.g., In re Acequia*, Inc., 34 F.3d 800, 807–08 (9th Cir.

1994). We therefore conclude that Bergner's reorganization plan does not preclude the present action.

◼ Bank One also makes a related argument, to the effect that any recovery in this action will no longer redound to the benefit of Bergner's estate, and thus the action must be dismissed for that reason. It is true that the Bankruptcy Code does not permit the avoidance of a preferential transfer unless the recovery would be for the benefit of the estate. See 11 U.S.C. § 550(a). It is also true that benefit to the creditors of the estate, rather than to the debtor alone, is necessary for recovery under § 550(a). See *Harstad v. First American Bank*, 39 F.3d 898, 905 (8th Cir.1994); 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 550.02[2] (1997). Bank One argues that because the unsecured creditors in Bergner's case have already recovered on their claims—at the agreed rate of thirty-three cents on the dollar—there is no way they could benefit from a recovery in the present case. Recovery by reorganized Bergner, it correctly notes, will only benefit the new owners of reorganized Bergner, which Bank One argues does not satisfy the statute.

◼ Bank One errs in its belief that recovery to the creditors of Bergner must be direct. See *Harstad*, 39 F.3d at 905; 5 *Collier on Bankruptcy* ¶ 550.02[2] n. 9 at 550–7; *In re Acequia, Inc.*, 34 F.3d 800, 811 (9th Cir.1994) ("Courts construe the 'benefit to the estate' requirements broadly, permitting recovery under section 550(a) even in cases where distribution to unsecured creditors is fixed by a plan of reorganization and in no way varies with recovery of avoidable transfers."). Here, we agree that recovery will benefit the owners of reorganized Bergner. But who are they? Under the plan, 100% of the equity in Bergner was distributed to the holders of the Swiss bank group's approximately $300 million in undersecured claims, who in exchange funded $25 million of the distribution to general unsecured creditors. Recovery in this preference action will benefit reorganized Bergner, as Bank One points out, which in turn will benefit the owners of reorganized Bergner—the largest creditor group of old Bergner. This is enough, in our view, to satisfy the requirements of § 550. See *In re Acequia, Inc.*, 34

F.3d at 811; *In re Trans World Airlines, Inc.*, 163 B.R. 964, 969–71 (Bankr.D.Del. 1994). A contrary holding would be in serious tension with the right of the debtor under § 1123 to continue pursuing claims after plan confirmation, as that right would mean little if it could be defeated by showing that recovery would not go to the original creditor group in its original form.

## III

◼ With those preliminary questions out of the way, we turn to the central issue on this appeal: did the courts below correctly find that Bergner's payments to Bank One to cover the AMC and Liberty Mutual transactions were voidable preferences under § 547(b), which were not eligible for either the new value or ordinary course of business exceptions of § 547(c)? Bank One argues that the lower courts should not have followed the independence principle that normally governs letter of credit transactions under the circumstances presented here, because in reality in AMC's case there was only a single economic transaction orchestrated by Bergner, in which it moved $31,-000,000 from its Swiss bankers, through Bank One, to AMC; in Liberty Mutual's case, Bank One argues, there was no diminution of Bergner's estate because the debit of $6,358,000 was inexorably tied to an equal credit in Bank One's "collateral account," and eventually to payments to Liberty Mutual. Bank One urges us to find that these transactions had no effect at all on the debtor's estate, and it argues that Bergner would receive a windfall if the debtor's estate were permitted to recoup the payments made to the bank. Bergner responds that Bank One's position ignores the independence of each part of the letter of credit transaction from each other part. If we were to follow Bank One's position, Bergner claims, we would be doing serious violence to the common business understanding of letters of credit and to the usefulness of the device in commercial transactions.

At first blush, one can understand Bank One's view of the transactions. Looking first at the AMC letter of credit, Bank One claims it was just a collection agent for Bergner. It

points out that its SLCA with Bergner required Bergner to prefund all draws before Bank One would pay anything, from which it reasons that the money just flowed through the bank, much as this court described a transaction not involving a letter of credit in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 896 (7th Cir. 1988). Bank One concedes that its position is not consistent with the independence principle that underlies letter of credit law, but it asks us not to "overemphasize" that principle so as to ignore the economic reality of a transaction for purposes of preference analysis.

The only problem with Bank One's argument is that letters of credit really are different from other financing mechanisms, and Bank One's position does not reflect the independent obligations that ran from the bank to the beneficiaries. From the point of view of the beneficiaries, AMC and Liberty Mutual, the way that Bank One settled its accounts with Bergner was of no importance, either legal or practical. As soon as Bank One issued the irrevocable letters in favor of each beneficiary (for a fee, as Bergner reminds us), it assumed the obligation of paying upon a draft supported by documents that conformed to the terms of the credit. Thus, when AMC presented its draft with conforming documents to Bank One on July 19, 1991, Bank One was required to pay AMC the full $31,207,000 that the letter of credit then provided, whether or not Bergner gave it a red cent. If Bergner did not comply with its own agreement with Bank One, under which it was required to give the bank the amount of the draw either before or at the time of the payment to the beneficiary, then Bank One would have had a perfectly good contract action against Bergner, but it would have had no defense against honoring the beneficiary's demand. See *In re Slamans*, 69 F.3d 468, 475 (10th Cir.1995); UCP, Int'l Chamber of Commerce Pub. No. 400, Art. 3, 16 (1983); Dolan, *The Law of Letters of Credit* ¶¶ 7.05[1], 2.01–2.02.

This means that at the moment AMC presented its draft, a debt arose between Bergner (as debtor) and Bank One (as creditor), in the amount of the requested draft. (This would not have been the case if, for example, AMC had demanded payment directly from Bergner, and Bergner had asked the bank to issue a cashier's check; in that situation the bank would have incurred no obligation to AMC if it had refused to write the check without sufficient funds from Bergner to cover it.) The debt was due, according to the SLCA, no later than the time when Bank One was required to honor the draft under its letter of credit to AMC. In order to pay its debt to Bank One, Bergner arranged for the transfer of $31,000,000 from the Swiss bank group to its account at Bank One. (Even though the time periods were quite short, as a result of the speed at which wire transfers can be accomplished through the Federal Reserve System, the underlying character of the transactions was no different than if these transfers had taken place over a period of weeks rather than hours or minutes.) Once Bergner placed the required amount of money in its account at Bank One, it authorized Bank One to take that money in satisfaction of its obligation under the SLCA, which Bank One did first by making its "memo posting," and later in the day by formally posting the transfer from Bergner to itself.

Still focusing on the AMC transaction, unless the existence of section 6 of the SLCA (under which Bergner gave Bank One a "security interest in and lien on any deposit account or other money now or hereafter owed [Bergner] by [Bank One]") alters the analysis, this breakdown of the transaction shows that Bergner indeed had a debt to Bank One, and that Bank One assured itself of payment in full within the preference period identified by § 547(b). Looking at the elements of § 547(b) (again putting to one side the question whether Bank One should be viewed as a secured creditor), we agree with Bergner that Bank One obtained a preferential transfer: there was a transfer in the amount of $31,207,000 of Bergner's funds to Bank One; the transfer was made on account of Bergner's antecedent obligation *under the SLCA* to pay Bank One the amount of a draw under the AMC letter of credit; the transfer was made while Bergner was insolvent; it occurred within ninety days of Bergner's filing its petition under Chapter 11; and the transfer allowed Bank One to be paid in full, even though other unsecured creditors would

not have received full payment in a liquidation of Bergner.

Bank One's three main arguments for why this payment is not avoidable under § 547(b)—that there was no transfer, that the transfer was not on account of an antecedent debt, and that Bergner's estate was not diminished by the transfer, in the sense of *In re Smith*, 966 F.2d 1527, 1535 (7th Cir.1992)—all in the end are nothing more than an attempted recharacterization of the transaction and an attack on the independence principle, neither of which we find persuasive. The discrepancy between the amount due to AMC under its letter of credit ($31,207,000) and the amount Bergner borrowed from the Swiss bank group to help cover AMC's draw ($31,000,000), while small, further illustrates the flaw in Bank One's position. Bergner paid Bank One $31,207,000 to fulfill its debt to Bank One; the source of $31,000,000 of that amount is no more important than the source of the remaining $207,000. The entire amount was Bergner's money at the pertinent time, which it used to pay a debt it owed to Bank One, its creditor.

Bank One attempts to avoid this logic in three ways: First, it argues that the new value exception of § 547(c) prevents the debtor from avoiding the preferential transfer. Next it argues that the transfers cannot be avoided because they were accomplished in the ordinary course of business, also a defense under § 547(c). Finally, it may be arguing that there were no avoidable transfers because it had preexisting perfected security interests in the monies it acquired.

■ Bank One's new value argument does not hold up under careful inspection. Focusing only on what *AMC* did with the money once it obtained it, Bank One points out that AMC (as it was required to do under the letter of credit) opened up an interest-bearing account in Bergner's favor and credited future orders from Bergner against this account. In Bank One's view, this shows that the debtor's estate was not depleted by the alleged preferential transfer: instead of the $31,000,000 represented by part of its credit line with the Swiss bank group, Bergner instead initially received $31,000,000 in credit from AMC, eventually replaced by merchandise of an equal value. Bank One suggests that section 547(c)(1) of the Bankruptcy

Code, which reads as follows, was designed for just this situation:

> (c)The trustee may not avoid under this section a transfer-
>> (1) to the extent that such transfer was-
>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>> (B) in fact a substantially contemporaneous exchange.

(The term "new value" means "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee...." 11 U.S.C. § 547(a)(2).)

The bankruptcy court rejected Bank One's argument for the straightforward reason that "[t]he only purpose for Bergner's deposit, which both parties knew would be swept up by the bank, was to pay Bergner's obligation on the letter of credit; there is no evidence Bergner intended by the deposit to purchase a credit balance at AMC." *In re Bergner*, 187 B.R. at 979. Furthermore, the bankruptcy court continued, Bank One itself did not incur a contemporaneous corresponding obligation to Bergner at the time it seized the funds, which would be necessary for the new value defense to succeed. Bank One's obligation ran independently to AMC, and it satisfied that obligation by paying AMC. *Id.* Like the district court, we find this reasoning sound. Bank One was not entitled to use the new value defense to defeat the debtor's recovery of the amount it paid to Bank One as a result of the AMC letter. Bank One can argue that Bergner obtains a windfall only by ignoring the independence principle. Bank One had no legally recognizable interest in what AMC did with the money or how its actions related to its dealings with Bergner. Bergner paid $300,000 for Bank One's promise to pay its supplier or insurance company whenever those parties presented conforming documents, and thus Bank One gave Bergner what was in effect a contingent loan (in the amount of the payments due to the beneficiaries) by issuing this letter. "Many bankers have rued the day they issued a standby letter of credit without assessing and

treating it as a true loan or without taking solid collateral as security." 3 James J. White & Robert S. Summers, Uniform Commercial Code § 26–1(b) at 110 (4th ed.1996).

Last, we note that *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224 (5th Cir. 1988) ("*FOSTI*") is not to the contrary—the court there was clear that the parties *intended* a third party's acts to provide new value to the debtor, and the independence principle was not implicated in that case, since the payments at issue occurred after a letter of credit had expired by its own terms with no payment made under that letter of credit. See *FOSTI*, 837 F.2d at 228. Bank One's alternative new value defense, under § 547(c)(4), fails as well, for both the above reasons and since Bank One gave no subsequent unsecured credit which remained unpaid. See *In re Prescott*, 805 F.2d 719, 728 (7th Cir.1986); 5 *Collier on Bankruptcy* ¶ 547.04[4].

■ The ordinary course of business defense is no more helpful to Bank One. As this court noted in *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 847 (7th Cir.1997), there are three requirements for that defense, each of which must be satisfied. The transfer must be:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

*Milwaukee Cheese*, 112 F.3d at 847, quoting 11 U.S.C. § 547(c)(2). In *Milwaukee Cheese*, we held that a "sudden payment in full of all debts in a discrete category, in anticipation of bankruptcy and for the purpose of helping a favored class of creditors, is the paradigm of a preference." *Id.* So here, even if the debt that Bergner incurred to Bank One arose in the ordinary course of business through the parties' longstanding SLCA, and even if (stretching things a bit) the payment was made according to ordinary business terms, we cannot find that the transfer was made in the ordinary course of the debtor's business. Indeed, it is clear that Bergner's precarious

financial situation was the only reason for the chain of events that began in May with Bank One's decision not to renew the AMC and Liberty Mutual letters of credit and culminated in AMC's decision to draw down the full amount of the credit and Liberty Mutual's decision to insist on a new letter. Events of default under the SLCA were occurring, which led to Bank One's efforts to protect its position. While understandable, its actions were not taken in the ordinary course of business as § 547(c)(2)(B) uses that term.

■ Although it is somewhat unclear from the briefs, Bank One may also be arguing that it had a perfected security interest in Bergner's deposit accounts at the bank, thus preventing avoidance. While this is the normal route for banks to avoid losses in bankruptcy when they pay beneficiaries under standby letters of credit, see James A. Rodenberg, *Letters of Credit in Bankruptcy: Can the Independence Doctrine Survive Preference Attacks?* 96 Com. L.J. 431, 452 (1991), Bank One had no security interest that could have helped it in these circumstances. Bank One is correct that section 6 of the SLCA granted it a security interest in Bergner's deposits in the bank. It argues that when it "memo posted" Bergner's account at 1:24 p.m. on July 19, it effectively froze the account and took control of the funds, which perfected its security interest. It concedes that a consensual security interest in a deposit account is outside the scope of Article 9 of the UCC, § 9–104(*l*), see Wis. Stat. § 409.104, but it argues that Wisconsin would recognize a common law security interest in the deposit account and that such a security interest is perfected by the bank's assumption of control over the account. (It cites only New York cases for this proposition, see *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988); *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548 (2d Cir.1976); Wisconsin courts seem not to have addressed the issue, except as to the general rule that cash proceeds may be traced to deposit accounts. See *Commercial Discount Corp. v. Milwaukee Western Bank,* 61 Wis.2d 671, 214 N.W.2d 33 (1974).) Bergner counters that Bank One itself admitted that it did not assume control over Bergner's account until

the end of the day, after it had paid AMC. The memo posting, by Bank One's own description, was not a "freeze" that might have perfected its lien, but rather just a "temporary record of the wire transfer" out of the account to AMC. Bergner also argues that the "memo posting" was not enough to satisfy the requirements of common law lien perfection, under which the secured bank must maintain exclusive access to the account and actually restrict depositor access by seizing the account or retaining an indispensable instrument like a passbook.

According to Dean Douglas Baird's leading article on standby letters of credit in bankruptcy, the question whether a bank can enforce its security interest in collateral after it honors a customer's letter of credit depends upon when the security interest attached and was perfected under state law. If attachment and perfection under state law take place more than ninety days before bankruptcy, the bank's security interest should prevail over the trustee's effort to set aside the transfer as a voidable preference, even if the bank does not assert control over the collateral until some time within the preference period. See Douglas G. Baird, *Standby Letters of Credit in Bankruptcy*, 49 U. Chi. L. Rev. 130, 149–51 (1982); see also *Fidelity Financial Services, Inc. v. Fink*, —— U.S. ——, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998) (holding that a creditor may invoke the "enabling loan" exception to the trustee's power to avoid a preferential transfer only by satisfying state law perfection requirements within the twenty-day period provided by 11 U.S.C. § 547(c)(3)(B)). Here, of course, Bank One did not assert control over Bergner's account until some time on July 19; prior to that time, Bergner had unrestricted access to funds in the account and could withdraw them at will. Thus, even if we assume that Bank One's actions were enough to perfect a common law security interest in Bergner's account, perfection did not occur until well within the ninety day preference period. "The transfer of the debtor's property takes place when the collateral is perfected by the issuing bank, not when the issuing bank makes payment under the letter." Rodenberg, *Letters of Credit in Bankruptcy*, 96 Com. L.J. at 452; *In re Compton Corp.*, 831 F.2d 586, 591 (5th Cir.1987). Under these circumstances, the bank's security interest does not survive the attack of the trustee or the debtor in possession. Cf. *In re Powerine Oil Co.*, 59 F.3d 969, 973–74 (9th Cir.1995) (to the extent an issuer was not secured preferences in its favor could be avoided).

We note finally that the analysis of the Liberty Mutual letter of credit is identical in all relevant respects to that of AMC's, even though Liberty Mutual did not draw on the letter until long after the petition for bankruptcy protection had been filed. By August 23, Bergner had an existing obligation to Bank One under the SLCA for $6,358,000; Bank One took steps to gain full control of the funds on deposit to cover Bergner's obligations under the SLCA on the very day Bergner filed its Chapter 11 petition—obviously within the ninety day preference period. The substitution of the new letter of credit for the old series of letters makes no difference, at least in any way that would help Bank One's position. (The record reflects that Bank One issued the new letter because Liberty Mutual otherwise would have drawn down the full amount to which it was eligible under the four older letters; it was thus in Bank One's own interest to issue this new letter, regardless of any effect on Bergner.) For the same reasons that we rejected the new value and ordinary course of business defenses with respect to the AMC letter, they are of no help to Bank One for the Liberty Mutual letter.

Bank One's actions seizing for itself both the $31,207,000 that Bergner paid it in satisfaction of Bergner's debt under the SLCA, and the $6,358,000 to assure its ability to collect from Bergner an amount equal to the new Liberty Mutual letter of credit were therefore avoidable preferential transfers under § 547(b), which Bergner is entitled to recover under § 550(a). In light of this conclusion, we have no occasion to reach the question whether the same transactions might also be viewed as setoffs subject to disallowance under 11 U.S.C. § 553(b)(1).

## IV

Last, Bergner has raised on cross-appeal the question whether the district court abused its discretion when it refused to

award prejudgment interest to Bergner. The bankruptcy court denied prejudgment interest to Bergner on the ground that it would have amounted to a windfall under the circumstances, because it was unlikely that Bergner would have had use of the money after the transfer in any event. The unsecured creditors might have received more than thirty-three cents on the dollar, but Bergner would not have seen any more money. *In re Bergner,* 187 B.R. at 984. The district court found that this was not an abuse of the bankruptcy court's discretion and affirmed.

█ We agree that the standard of review here is for abuse of discretion, see *Milwaukee Cheese,* 112 F.3d at 849, but we see an inconsistency between the lower courts' treatment of the value of the funds to Bergner in this context with their analysis (with which we have agreed) of Bergner's standing to bring this suit at all. The new owners of Bergner, recall, are the largest class of unsecured creditors of the firm. Prejudgment interest on the award would benefit them, just as recovery of the preferential transfers will benefit them. As the lower courts recognized, prejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money. See *Milwaukee Cheese,* 112 F.3d at 849. The district court implied that it had some discomfort with the bankruptcy court's result, and we share that view. Indeed, because "[d]iscretion must be exercised according to the law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so," *id.,* we conclude that it was an abuse of discretion, based on the failure to recognize Bergner's status as the successor to the creditors' claims, not to make prejudgment interest a component of Bergner's judgment. We therefore reverse that part of the district court's judgment and remand for purposes of calculating the proper amount of interest to add to the judgment.

For the foregoing reasons, we AFFIRM the judgment of the district court in all respects except for its decision not to award prejudgment interest to Bergner. We REVERSE and REMAND for the limited purpose of allowing the district court to amend its judgment to include the appropriate amount of interest in its award. Costs on appeal are to be taxed against Bank One.