**In re GLOBE BUILDING MATERIALS, INC., Debtor.**

**Gordon E. Gouveia, Chapter 7 Trustee of Globe Building Materials, Inc., Plaintiff,**

**v.**

**The RDI Group, Inc. d/b/a Reichel & Drews, Inc., Defendant.**

**Bankruptcy No. 01–60182 JPK. Adversary No. 02–6327.**

United States Bankruptcy Court, N.D. Indiana, Hammond Division.

May 12, 2005.

254

William J. Barrett, Esq., Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg LLC, Chicago, IL, for defendant.

Peter J. Roberts, Esq., and Janice A. Alwin, Esq., Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin LLC, Chicago, IL, for trustee.

*MEMORANDUM OF DECISION*

J. PHILIP KLINGEBERGER,
Bankruptcy Judge.

In this adversary proceeding, the plaintiff Gordon E. Gouveia as the Trustee of the Chapter 7 bankruptcy estate of Globe Building Materials, Inc. ("Trustee") seeks to assert the provisions of 11 U.S.C. § 547(b) to recover alleged preferential payments made by the debtor to the defendant The RDI Group, Inc. d/b/a Reichel & Drews, Inc. ("RDI"), and RDI in turn seeks to avoid liability to repay the alleged preferential payments by assertion of the "ordinary course of business" defense under 11 U.S.C. § 547(c)(2) and the "new value" defense under 11 U.S.C. § 547(c)(4).

The case was initiated by complaint filed on December 26, 2002, to which RDI responded by answer filed on January 24, 2003. The parties filed a Stipulation on May 19, 2004 which provides most of the evidentiary record for the purpose of decision; the balance of the decisional record was produced at an evidentiary hearing held on August 5, 2004. The post-trial briefing schedule closed on January 20, 2005.

The Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. § 1334, 28 U.S.C. § 157, and N.D. Ind. L.R. 200.1. The adversary proceeding before the Court is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

I. *FACTS*

The Court determines the facts as follows, pursuant to Fed. R. Civ. P 52(a), made applicable to this adversary proceeding by Fed. R. Bankr.P. 7052.

Globe's primary business was the manufacture of roofing shingles. RDI and Globe entered into a contract by which Globe agreed to purchase from RDI, and RDI agreed to sell to Globe, a line of custom-built "In–Line Lamination Equipment." This equipment line was a series of component "sub—machines" which, when assembled together, resulted in a machine to be utilized by Globe to produce laminated shingles.

Paragraphs 3, 8, 9 and 10 of the parties' Stipulation identify the documents which formed the parties' contract. Paragraph 3 states that the primary transfer at issue "was made on account of an existing debt owed by Globe to RDI ... under the Accepted Proposal, the Queisser Letter, and the Acknowledgment". The "Accepted Proposal" is identified in paragraph 8 of the Stipulation as Exhibit "A" to the stipulation. All but the last page (page 49) of that exhibit contains the specifications for the components of the machine that was being purchased from RDI. Page 49 states the terms of payment and the terms of delivery. Exhibit "B" is an acknowledgment issued by RDI of Globe's acceptance of Exhibit "A", and it reiterates the payment and delivery terms of Exhibit "A" (paragraph 8 of the Stipulation). The original contract, comprised of Exhibits "A" and "B", stated a price for the entire machine of $4,080,950.00. As stated in paragraph 9 of the Stipulation, several change orders were submitted with respect to the machine to be produced by RDI, which resulted in the final amended price of $4,210,745.00. The parties also stipulated in paragraph 9 that the change order amendments "did not change the schedule of progress payments" as stated in the original contract. The "Queisser Letter" is Exhibit "D". This letter modifies the payment schedule.

Putting the three contract documents together, the payment arrangement was that Globe was to have made an initial $50,000.00 payment, which was received in January, 2000. Globe was then to make a $50,000.00 payment on February 1, 2000, and another $50,000.00 payment on Febru-

ary 14, 2000, so that by February 14, 2000 Globe should have paid RDI $150,000.00. The Queisser Letter states that on February 29, 2000, Globe would make another payment of $258,095.00, which would satisfy the initial 10% requirement. The Letter then stated "Globe will then make regular monthly payments as listed in the proposal." Paragraph 12 of the Stipulation sets out the parties' stipulation as to the contract terms for payment, in the first chart in that paragraph. That chart differs somewhat from the terms noted earlier in this paragraph. The second chart in paragraph 12 of the Stipulation provides the actual payments made by Globe. Initially, Globe was a little bit behind in the payment schedule. However, as of March 31, 2000, according to the paragraph 12 payment schedule, Globe should have paid $408,095.00; as of that date, Globe had in fact paid that amount. By April 30, 2000, Globe should have paid another $408,095.00, and by May 31, 2000, Globe should have paid another $408,095.00. In fact, Globe paid $250,000.00 on May 5, 2000, and then paid $1,026,397.72 on June 9. Thus, as of June 9, although Globe had fallen somewhat behind as of May 31, Globe was actually ahead. As the second chart in paragraph 12 shows, by the end of October of 2000, Globe was essentially one monthly installment payment behind, but that payment was made on November 2, 2000.

As of November 2, 2000, Globe had paid $3,786,555.72 to RDI with respect to the contract for purchase of the equipment line. The contract provided that the final installment payment of 10% of the contract price was to have been made "upon start-up or 90 days of shipment." Based upon the Stipulation, 10% of the total contract price of $4,210,745.00 is $421,075.00. If one adds this payment amount to the $3,786,555.72 total of payments made as of November 2, one achieves the sum of $4,207,630.72, which is slightly less than the full contract price. So, as of November 2, 2000—the date the primary preferential payment at issue in this case was made—Globe was essentially current with respect to the payment schedule.

The record is devoid of any evidence which indicates that RDI ever altered its production schedule, threatened to alter its delivery schedule, or otherwise threatened any action against Globe for the slight deviations it made from the original payment schedule: in other words, the record makes it clear that RDI never considered Globe to be in default with respect to the payment terms of the contract.

Paragraph 11 of the Stipulation states that the "agreement between RDI and Globe provided for the sale of a completed equipment line comprised of several discreet components of machinery". The record, including the testimony of RDI's sales manager Michael Queisser, makes clear that the payment schedule of the contract was not geared toward deliveries of component parts of the equipment line. As Mr. Queisser testified, the parties contracted for the production by RDI of a single integrated system—a line of equipment to be utilized by Globe to make laminated shingles. It is clear that the parties contracted for the purchase of one thing, i.e., a production machine comprised of integrated components—but nevertheless one machine. The parties' transaction was not a series of severable component purchases, leading to ultimate purchase of all of the components to assemble the machine. As Mr. Queisser testified, RDI committed to sell a single complete unit, and not components to be assembled into a single complete unit. The price arrived at between the parties reflected the sale/purchase of a single integrated unit.

The last page of Exhibit "A" states the original terms of delivery. Shipment of the component parts of the machine was to begin in September 2000. Paragraph 15 of the Stipulation states that the delivery schedule is defined by Exhibit "F", issued by RDI on October 2, 2000. That paragraph of the Stipulation states that RDI in fact made its first shipment of components to Globe on October 2, 2000, which means that RDI did not meet the shipping dates for the first two components stated in Exhibit "F". Paragraph 16 of the Stipulation states the shipments made by RDI of component parts of the machine prior to November 2, 2000—the date of the preferential payment. Paragraph 17 contains a chart which states all shipments made by RDI, including those made subsequent to the date of the alleged preferential payment. Paragraph 17 contains the Stipulation of the parties that the entire machine being purchased by Globe was actually delivered to Globe by January 18, 2001, with the exception of the pieces the parties have identified as "Retained Components", designated in the second line of the first chart in paragraph 16 of the Stipulation. As stated in paragraph 15 of the Stipulation, the Retained Components were not shipped to Globe because Globe asked RDI "to hold the components pending further directions". The evidence of record establishes that these Retained Components still remain in the possession of RDI, and have never been delivered to Globe.

Paragraph 19 of the Stipulation states that during the period of November 1, 2000 through January 11, 2001, RDI sold and delivered to Globe certain spare parts. The amount billed by RDI to Globe with respect to these parts was $74,672.65. In footnote 3 on page 2 of the Trustee's Post–Trial Response Brief, the Trustee has conceded that this amount represents "new value".

Paragraph 1 of the parties' Stipulation states the payments made by Globe to RDI during the preference period. Principal among those payments was a payment of $419,891.00 made on November 2, 2000. Exclusive of the payment on November 2, 2000 [which the chart in paragraph 1 of the Stipulation states was made on November 6, 2000, essentially the date the draft making that payment was "paid" by the drawee], Globe made a total of $15,425.20 in payments to RDI. Thus, the total of payments made by Globe to RDI during the preference period was $435,316.28.

The difference between the payments made by Globe to RDI during the preference period ($435,316.28) and the invoiced billings for the spare parts is $360,643.63. It is this amount which the Trustee seeks to recover.

By paragraphs 1 through 5 of the Stipulation, all essential facts necessary for the Trustee to sustain his burden of proof under the elements of 11 U.S.C. § 547(b) with respect to the payments made by Globe to RDI during the preference period, have been established.

## II. *ISSUE*

The matter in dispute between the parties is whether the $360,643.63 of payments made by Globe to RDI during the preference period constitute preferential payments under the provisions of 11 U.S.C. § 547(b) which the Trustee may recover from RDI. In response to the Trustee's assertion they are, RDI has raised the affirmative defense provided by 11 U.S.C. § 547(c)(2) that the payments were made "in the ordinary course of business", and the affirmative defense provided by 11 U.S.C. § 547(c)(4) that it provided "new value" to Globe after it received the alleged preferential payments. RDI's principal argument is essentially that the

value of the component parts of the machine purchased by Globe which were shipped to Globe subsequent to the making of the alleged preferential payment, and the value of the spare parts, constitutes "new value".[1]

### III. *LEGAL ANALYSIS*

The Trustee's action is premised on 11 U.S.C. § 547(b), which states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Pursuant to paragraphs 1–5 of the parties' Stipulation, the Trustee has sustained the burden of proof imposed upon him by 11 U.S.C. § 547(g) to establish that the payments totaling $435,316.28 made by Globe to RDI during the 90–day period provided by 11 U.S.C. § 547(b)(4)(A) are preferences.

While RDI does not dispute that the payments were preferences, RDI contends that the payments are not recoverable by the Trustee based upon the provisions of 11 U.S.C. § 547(c)(2) and upon 11 U.S.C. § 547(c)(4).

First, this action, as established by the record before the Court, revolves exclusively around the provisions of 11 U.S.C. § 547(c)(4). RDI has not submitted sufficient evidence to sustain its burden of proof with respect to the defense under § 547(c)(2). Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer—

. . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

The burden of establishing this defense is on RDI; 11 U.S.C. § 547(g); *In re Prescott*, 805 F.2d 719, 727 (7th Cir.1986). In order to sustain the affirmative defense,

---

**1.** RDI also contends that the Retained Components may constitute "new value", apparently in essence because they were identified to the Globe/RDI contact and may thus actually constitute Globe's property. As will be seen, based upon the premises of this decision, the Court does not need to resolve whether or not title to the Retained Components passed from RDI to Globe, or whether the estate of Globe was enhanced by the "value" of those components.

the record must establish that the payments made by Globe to RDI were "made according to ordinary business terms" [§ 547(c)(2)(C)], which in turn requires essentially expert testimony as to the manner in which payments are customarily made in the transferee's industry; *In re Tolona Pizza Products Corporation,* 3 F.3d 1029 (7th Cir.1993); *In re Midway Airlines Incorporated,* 69 F.3d 792 (7th Cir.1995). There is no evidence in this record which establishes the requirements of 11 U.S.C. § 547(c)(2)(C), and thus RDI's affirmative defense on the basis of "ordinary course of business" has not been sustained.

■ 11 U.S.C. § 547(c)(4) states:

(c) The trustee may not avoid under this section a transfer—

. . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

RDI again has the burden of establishing this defense; 11 U.S.C. § 547(g); *In re Prescott, supra.*

It is undisputed that the component parts of the equipment line delivered by RDI to Globe after November 6, 2000 had "value." However, the critical issue in this case is whether those components provided "new" value to Globe. The phrase "new value" is defined by 11 U.S.C. § 547(a)(2) as follows:

(a) In this section—

. . .

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

The basic requirements of the "new value" affirmative defense were outlined as follows in *In re Sonicraft, Inc.,* 238 B.R. 409, 414–15 (Bankr.N.D.Ill.1999) as follows:

For a preferential transfer to be excepted from avoidance under § 547(c)(4), the following three events must have occurred, in order:

(1) The creditor must have received a transfer which is otherwise voidable as a preference under § 547(b);

(2) After receiving the preferential transfer, the preferred creditor must have advanced additional credit to the debtor on an unsecured basis; and

(3) That additional post-preference unsecured credit must be unpaid in whole or in part as of the date of the bankruptcy petition.

*Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg. Inc.),* 62 B.R. 684, 686 (Bankr.N.D.Ill.1986), *See also Schwinn Plan Comm. v. AFS Cycle Ltd. (In re Schwinn Bicycle Co.),* 205 B.R. 557, 568 (Bankr.N.D.Ill.1997). If these elements are satisfied, the creditor may set off the amount of the post-preference unsecured credit still unpaid as of the date of the petition against the amount the creditor must return to the trustee on account of the preferential transfers. *Id.*

These standards are of little assistance in this case. Unlike most "new value" cases, this case involves a "unitary" transaction in which RDI agreed to sell to

Globe, and Globe agreed to buy from RDI, a single thing, i.e., a machine to be used by Globe in the manufacture of shingles. This is thus not a "divisible" contract, by which Globe was separately and severally purchasing component parts which it would ultimately then assemble into a whole machine at its plant. The contract which defines the parties' business arrangement in essence provides for "front loaded" payments by Globe to RDI before Globe was ever to receive the first delivery of any portion of the machine that it purchased from RDI.[2] Again, this commercial transaction involves the following elements:

1. The purchase of a single item, a shingle-manufacturing machine.

2. Under the parties' contract, Globe was required to pay a significant amount of the total contract price before *any* part of the machine it purchased from RDI was to be delivered to it.

3. Under the parties' agreement, the delivery schedule of component parts of the machine has no correlation at all to any value of component parts of the machine to be delivered, and payment of any specified amount by any specified date by Globe to RDI does not correlate in any manner to RDI's obligation under the contract to deliver certain component parts of the machine to Globe.[3]

■ The "new value" defense must be measured against the basic framework of the parties' commercial contractual arrangement.

RDI asserts that value of the machine components delivered to Globe subsequent to the making of the November 2 (November 6), 2000 payment—however that value is to be determined—constitutes "new value" which provides it with an offset against what would otherwise be a preferential payment to it by Globe. Globe, on the other hand asserts that by the time the November 2 (November 6) payment was made, it had already paid for the composite component value of the full machine in an amount which had by that date *exceeded* the value of what it had received. In the Court's view, both parties have missed the mark by analyzing this case under 11 U.S.C. § 547(c)(4). This is simply not a "new value" case.

We begin with the premise that nearly all 11 U.S.C. § 547 preference actions involve unsecured creditors. A creditor who is alleged to have received the preferential payment, by the time the alleged preferential payment has been made to it, has by definition, provided the debtor with something of value in advance of receiving payment for it. As the Court has already had occasion to explain to a number of unfortunate preferential payment targets, it may seem at first blush that § 547 is not fair: the creditor has already given up something of value that approximates, or may have even been more than, the amount of the payment which the creditor received during the preference period for providing that item to the debtor. We don't need to burden this opinion with the theory of preferences, but it is important to note

---

2. This arrangement was obviously to make certain that Globe did not "get ahead" of RDI in terms of having component parts of the machine delivered to it without having paid RDI for the obviously substantial production costs of the component parts of the machine.

3. The parties' contract, as established by the record, does not even contain a "conditional"

delivery provision by which RDI's obligation to deliver was conditioned upon Globe's having made certain payments by the assigned delivery date. While the Uniform Commercial Code may fill in the gaps in this commercial arrangement, the parties' express contract does not do so.

that a preferential payment target has already—in almost all circumstances—provided the debtor with something of value (a good, a service, or an extension of credit) which it now trails the debtor on with respect to the reciprocal payment arrangement provided by the parties.

■ It is important to note that 11 U.S.C. § 547(c)(4) requires a creditor to give "*new* value" in order to defeat a preference recovery. The definition of "new value" provided by 11 U.S.C. § 547(a)(2) really does nothing to elaborate on the essential adjective "new". Clearly, however, 11 U.S.C. § 547(c)(4) does not hinge on the provision by a creditor to a debtor of "value"—the value must be "new", whatever that word may mean as determined by courts called upon to construe it.

This is a unique case, at least as far as reported decisions under 11 U.S.C. § 547(c)(4) go. The Court's research has been unable to locate *any* reported decision having the seminal circumstances which this one does, and the parties have not directed the Court to any such case.

In the Court's view, this is simply not a "new value" case under § 547(c)(4). As stated above, the parties' commercial arrangement was that Globe agreed to buy a "machine" from RDI. Because of the nature of the "machine", in light of industrial manufacturing necessities, the "machine" was manufactured in component parts, which were then to be fitted together at Globe's plant to form the actual item purchased. The fact that the "good" purchased by Globe was to be manufactured and assembled in apparently discreet component parts has nothing whatsoever to do with the underlying basis of the parties' commercial transaction. This fact is amply evidenced by the record. The pre-delivery installment arrangement by which Globe was to pre-pay RDI prior to delivery of *anything* is not in any manner geared to delivery to Globe of discreet components necessary to complete the "machine" when it was fully assembled. The delivery schedule for delivery of the separate component parts of the "machine" is not in any manner geared toward payment by Globe by the time of delivery of any portion of the total purchase price as could be allocated to the components to be delivered. Again, this is—in the parlance of the Uniform Commercial Code—an "indivisible" contract. There are, of course, certain seller's and purchaser's remedies in the event that the other party to the contract breaches an "indivisible" contract during the course of its performance; however, there is no evidence in the record that either party ever even contemplated that any breach had occurred, or that any demand for performance under the remedies provided to parties in the context of a "indivisible" installment contract under the Uniform Commercial Code were ever even hinted at by either party to this arrangement.

Thus, what we have here is a situation in which RDI agreed to manufacture a machine for Globe; Globe agreed to pay RDI for the machine according to an installment payment schedule; and RDI agreed to deliver the machine in identifiable component parts which did not in any manner correlate to costs or contract price allocable to the component parts to be delivered.

■ As very cogently stated in *In re Quality Plastics, Inc.*, 41 B.R. 241, 242 (Bankr.Mich.1984):

The purpose of the § 547(c)(4) exception is to "insulate[ ] from preference attack a transfer to a creditor to the extent that the creditor thereafter replenishes the estate." Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am. Bankr.L.J. 173, 187 (1979). In such a

situation, other creditors would not be harmed to the extent of the offset and the fundamental goal of equality of distribution is preserved.

Thus, the goal of § 547(c)(4) is to not punish a creditor who receives a preferential payment to the extent that the creditor—subsequent to the receipt of the allegedly preferential payment—replaces in the estate something of value, and to only allow the recovery of the alleged preferential payment to the extent that the value of the creditor's replacement was less than the amount of the payment received by the creditor for transactions which pre-dated the receipt of the payment.

RDI asserts that the value of the component parts of the machine which it delivered to Globe subsequent to the date of its receipt of the November 2 (November 6) payment was greatly in excess of the amount of that payment, and thus that it provided "new value" to Globe. The simple fact is that RDI provided *nothing* to Globe that it was not commercially required to provide under the terms of its contract with Globe. As established by the record, Globe was essentially current in its payment schedule under its contract with RDI at the time that RDI delivered the component parts of the "machine" which it deems to constitute "new value"; in fact, under the terms of the parties' agreement, Globe's last payment was not yet due by the time that it had received all of the parts of the machine ever delivered to it. If RDI had not delivered those component parts at that time, it would have breached its contract with Globe. An interesting facet of RDI's argument is that, as established by paragraph 18 of the parties' stipulation, "RDI had no notice or knowledge of Globe's bankruptcy filing until after the filing occurred in January 2001". Thus, at all times prior to the bankruptcy filing, RDI proceeded with Globe as it obviously would have proceeded with any other commercial customer under similar circumstances—it proceeded to honor its contract for the provision of an entire "machine" as long as its customer continued to adhere to its obligations with respect to installment payments for the "good" to be provided by RDI.

An obvious purpose of the § 547(c)(4) affirmative defense is to encourage creditors who have commercial arrangements with what will ultimately become a "debtor" who is in default with respect to payments to the creditor/vendor, to continue to deal with the debtor despite the debtor's default. The creditor is "rewarded" for its *voluntary provision of a good, a service or an extension of credit in a circumstance in which it had no obligation to provide anything to the debtor.* This concept is the crux of the "new" in "new value." Recalling as we must that preference actions essentially focus on unsecured commercial transactions, this goal of encouraging "voluntary" payment arrangements to work out defaults with critical vendors/creditors is exemplary. However, in this case, the commercial arrangement between RDI and Globe was not a series of discreet or severable transactions—it was one contract for the purchase of a machine. RDI's argument seeks to reconstitute the parties' agreement into a "divisible" contract, whereby delivery of certain component parts necessary to assemble the completed "good" purchased by Globe from RDI is tied to Globe's periodic payments with respect to the discreet components to be delivered. That is simply not the parties' agreement in this case. The "new value" defense of § 547(c)(4) is designed to encourage, or at least to not punish, creditors who extend accommodations to a debtor by delivering goods/services/credit to the debtor despite the debtor's failure to honor the payment terms by which the creditor

had previously provided goods/services/credit to the debtor. There is no indicia of that type of relationship in this case. This is a straight-up commercial transaction in which Globe agreed to purchase a machine from RDI, and agreed to pay for the machine in installment payments which actually provided RDI with a contractual advantage in terms of the value of what Globe received from RDI until almost the end of the contract in relation to what Globe paid to RDI.

As noted above, a corollary of the § 547(c)(4) defense is that it is unfair to recover a payment made to an unsecured creditor by a debtor to the extent that subsequent to the receipt of the payment the creditor provides the debtor with "new value" which theoretically will ultimately inure to the benefit of the debtor's creditors, or at least inure to the benefit of the debtor during the period between the provision of the "new value" and the date of the debtor's bankruptcy petition. An interesting case in the context is *Quality Plastics, Inc., supra.* In that case, the debtor made payments to a lessor from which it leased injection molding machines. *Despite being in default under the terms of its lease,* the creditor did not terminate the lease arrangement and allowed the debtor to continue to use the injection molding machines in the operation of its business. The court specifically found that the debtor used the leased machines in its business to "produce parts which helped augment the debtor's estate to the benefit of other creditors"; *Quality Plastics, Inc., supra,* 41 B.R. at 243.

In this case, the record establishes that Globe never utilized the machine which it purchased from RDI. In fact, the machine which was purchased by Globe from RDI was sold by the debtor for *substantially less* than the amount which Globe had paid to RDI for the purchase of the portions of the machine which it sold during the pendency of its bankruptcy case. Thus, query: Given that by the time RDI delivered the components of the machine subsequent to the November 2 (November 6) payment, how did RDI enhance Globe's estate at all. The machine was never put into use to produce income-producing goods to be sold by Globe, and the machine was ultimately sold for far less than what Globe had paid RDI for its acquisition.

Moreover, and more critically, while RDI may have provided "value" to Globe by delivering certain components of the purchased machine to Globe subsequent to its receipt of the November 2 (November 6) payment, what was "new" about that value? Nothing. RDI extended no accommodations to Globe by delivering those components because RDI quite simply would have breached its commercial transaction agreement with Globe had it not done so. This case does not present a circumstance in which the § 547(c)(4) affirmative defense of "new value" is intended to be operative. In this case, the parties entered into an indivisible commercial contract under which the both continued to seasonably perform until Globe filed bankruptcy. RDI cannot elevate its commercially reasonable performance of its contract—in fact a performance which could have essentially been legally compelled by Globe—to an offset for "value" which it provided as it was contractually and legally required to do.

The Trustee is entitled to recover the amount of $360,643.63 from RDI pursuant to 11 U.S.C. § 547(b).

■ The Trustee's complaint requests an award of pre-judgment interest, a request which the Court deems appropriate to grant. The Trustee is entitled to pre-judgment interest (see *Matter of P.A. Bergner & Co.,* 140 F.3d 1111, 1123 (7th

Cir.1998)); *In re Industrial & Mun. Engineering, Inc.,* 127 B.R. 848, 851 (Bankr. C.D.Ill.1990) under 28 U.S.C. § 1961 from December 26, 2002 (the date of filing of adversary complaint) to the date of entry of judgment at the rate of 1.41% per annum.

▮ The Trustee's complaint finally requests that RDI's claim be disallowed in its entirety. The Court has determined that RDI is liable to the Trustee for the amount of $360,643.63 plus pre-judgment interest. Pursuant to 11 U.S.C. § 502(d), unless and until RDI pays this amount to the Trustee, including post-judgment interest thereon to the date of payment, RDI's claim cannot be allowed.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED: that the plaintiff Gordon E. Gouveia, Chapter 7 Trustee of Globe Building Materials, Inc., shall have and recover judgment against the defendant The RDI Group, Inc d/b/a Reichel & Drews, Inc. in the amount of $360,643.63, plus pre-judgment interest thereon at the rate of 1.41% per annum from December 26, 2002 to the date of entry of judgment—the total amount of said judgment to bear interest at the rate of 3.33% from the date of entry of the judgment.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that until this judgment, including post-judgment interest to the date of payment in full, has been paid by the defendant to the plaintiff, any claim filed by The RDI Group, Inc d/b/a Reichel & Drews, Inc. against the Chapter 7 bankruptcy estate of Globe Building Materials, Inc. shall not be allowable as a claim against that bankruptcy estate.