In the Matter of MILWAUKEE CHEESE WISCONSIN, INCORPORATED, Debtor–Appellee.

Appeals of Jack STRAUS, Violet Straus, Wayne Treder, La Rue Treder, and Louis Beguhn.

Nos. 96–3219 to 96–3221.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1997.

Decided April 28, 1997.

Dona J. Merg, Merg & Anderson, Madison, WI, Donald W. Bays, Osstyn, Bays, Ferns & Quinnell, Marquett, MI, Jonathan F. Thoits (argued), James B. Frakie, Day & Sawdey, Grand Rapids, MI, for Appellants.

Robert L. Mann, Kohner, Mann & Kailas, Milwaukee, WI, for Debtor–Appellee.

Before ESCHBACH, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Milwaukee Cheese set up a "thrift savings plan" for its employees. The plan offered the convenience of payroll deductions plus an attractive rate of interest; the firm credited long-term employees with additional amounts under an informal profit-sharing plan. Problem: Milwaukee Cheese was not a bank and did not establish a credit union. (It could not have done so; the firm permitted employees' friends and relatives to participate, spoiling the common bond of employment that is required for a credit union. 12 U.S.C. § 1759.) Funds designated for the "thrift savings plan" were commingled with the corporation's general revenues rather than held in trust. "Depositors" therefore were unsecured debt investors in the firm. Violations of ERISA and the banking and securities law are too numerous to count.

In 1985 Milwaukee Cheese encountered financial distress. Most of the "depositors" asked for their money and were promptly paid; those who did not were paid anyway. Within 90 days the firm's creditors placed it into involuntary bankruptcy under Chapter 7 of the Bankruptcy Code of 1978. On the date the petition was filed, the firm's assets were worth about $2 million, and secured creditors held claims exceeding that sum. They were not pleased to discover that this group of unsecured investors had been paid in full. The trustee commenced a preference-recovery action. After 10 years of litigation the district court concluded that the "withdrawals" were indeed preferences, avoidable under 11 U.S.C. § 547(b). The long delay—caused by repeated multi-year periods in which motions were under advisement before bankruptcy and district judges—is exceedingly unfortunate. The firm's ex-employees were entitled to know, much sooner than they did, what resources they would have to live on. For some the

stakes are considerable. The Treder family, for example, withdrew almost $130,000 in 1985, and has been ordered to repay that amount plus more than a decade's prejudgment interest. The stakes for the Straus family are roughly $30,000 plus interest. But there is nothing we can do now to redress the delay, except bring to a speedy conclusion the appeal filed by these two families.

One line of argument—that Milwaukee Cheese held the balances of the thrift "accounts" in constructive trust for the "depositors," so that the money was never the debtor's property, see 11 U.S.C. § 541(a)(1)—was rejected by the bankruptcy court and has not been renewed. After *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), inability to trace the commingled proceeds, coupled with the fact that other creditors could have levied on the money while it was in the firm's hands, dooms such a contention. See also *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995); *Belisle v. Plunkett*, 877 F.2d 512 (7th Cir.1989); Douglas G. Baird, *The Elements of Bankruptcy* 111–13, 172–73 (rev. ed.1993). All of the requirements for preference recovery under § 547(b) have been satisfied. Thus the "depositors" are reduced to relying on § 547(c)(2), which provides that a trustee may not avoid a transfer

> to the extent that such transfer was—
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms[.]

Judge Clevert (then Chief Judge of the Bankruptcy Court) initially held that the debt had not been "made according to ordinary business terms" (sec.547(c)(2)(C)) because the thrift savings plan violated Wisconsin's banking laws. Cf. *In re Bullion Reserve of North America*, 836 F.2d 1214 (9th Cir.1988). Judge Reynolds reversed this decision after concluding that the questioned *transfer*—that is, the repayment of the "deposits"—had not violated state law.

He remanded for further proceedings. Judge Clevert once again relied on § 547(c)(2)(C) but used a different rationale: that repayment departed from ordinary terms because the parties (and the industry) had not established a practice of making such withdrawals. The renewed appeal was assigned to Judge Curran, who affirmed. On appeal to this court, the "depositors" contend that the cheese industry is the wrong benchmark for defining "ordinary business terms" and that, at all events, they should not have been required to pay prejudgment interest.

Although the litigants have devoted much energy, and many years, to the fine points of § 547(c)(2)(C), we do not see how transfers under these circumstances could satisfy § 547(c)(2)(B): that the transfers have been "made in the ordinary course of business or financial affairs of the debtor". Both sides at times confuse the requirement of § 547(c)(2)(C) that transfer be made according to ordinary business terms with the requirement in § 547(c)(2)(B) that repayment occur in the ordinary course of business. As a result they have not kept the subsections altogether separate. But the trustee's references to § 547(c)(2)(B) suffice to justify its use as a ground on which to affirm the judgment, even though the bankruptcy court thought this subsection satisfied and the district court did not mention it (though its significance had been argued to that court). See *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976). The function the bankruptcy and district judges attributed to subsection (C) is, we believe, performed by subsection (B):

 A sudden payment in full of all debts in a discrete category, in anticipation of bankruptcy and for the purpose of helping a favored class of creditors, is the paradigm of a preference. Section 547 is designed to discourage (by eliminating the fruits of) a race immediately before bankruptcy to get all of one's own debt repaid, and let the devil take the hindmost—for this race, costly to the runners, can impose even greater costs on other creditors (who must strive to protect themselves, perhaps by filing premature

bankruptcies, and bear extra losses if they do not) and the firm itself, less able to compete in product markets with its assets scattered. See *Union Bank v. Wolas*, 502 U.S. 151, 160–62, 112 S.Ct. 527, 532–34, 116 L.Ed.2d 514 (1991); *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993); *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1194 (7th Cir.1989); Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 122–38 (1986). The exceptions in § 547(c) identify cases where there is little risk that the pre-bankruptcy payments will give rise to this race and to the concomitant costly self-protection. A debtor who routinely receives a phone bill on the 5th of the month and pays on the 20th acts in the ordinary course; even if the phone company turns out to be a favored creditor (because the debtor neglects to pay other bills at the same time), the routine payment of regular bills is some distance from the problem at which § 547 itself is directed, and the cost of tracking down and retrieving each payment would be excessive. So if Milwaukee Cheese paid its regular bills in the three months before bankruptcy on a regular schedule, the recipients would be protected by § 547(c)(2), even if the bills were attributable to its illegal banking operations. Just so if the "depositors" received regular monthly payments from their "accounts"—if, for example, Milwaukee Cheese wrote monthly checks for the interest, rather than crediting interest to the accounts. *Wolas* holds that ordinary payments on debt come within the safe harbor, even if the debts are long term.

■ Nothing about the payments to the "depositors" was remotely ordinary, however. They had made long term investments, and for any one of them to demand repayment in full was abnormal. That is not how Milwaukee Cheese and the "savers" had conducted themselves in the past; withdrawals had been for less than the full balance. Although large withdrawals had been rare, in late 1985 everyone withdrew everything in full. Judge Clevert found that many of the "depositors," including the Straus and Treder families, did not know about the firm's impending demise when they asked for their money back; we accept this conclusion, implausible though it is (a "run" on a bank, or a cheese company,

comes from at least a fear of insolvency, even if the fear is not well grounded). Section 547(c)(2)(B) is not satisfied just because each creditor perceives the payment to be justified. None of these transactions represented a continuation, into the 90–day period before the petition, of routine transactions between Milwaukee Cheese and the "savers." Even if these transactions were ordinary from the transferees' perspectives (they weren't), they must be ordinary from the debtor's perspective too, *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir.1986), and again they weren't. Milwaukee Cheese's managers knew that the firm was in trouble. They knew that the "thrift savings plan" was a major source of the firm's working capital, not a savings account of any kind. Repaying all of the "depositors," whether or not they asked for their money back, demonstrates how far out of the ordinary these transactions were. Within a short time the firm disbursed more than $325,000, or about 15 percent of the firm's total value, greatly exceeding its cash on hand. To finance the repayments Milwaukee Cheese borrowed from a bank, giving security in exchange. That kind of transaction was extraordinary for the firm. Section 547(c)(2) offers no defense; if it did, then it would exempt from § 547(b) the kinds of transactions that lie at the section's core.

■ Appellants tell us that bankruptcy is an equitable doctrine and ask us to bend the rules a little to protect innocent investors. Yet "a bankruptcy court is a court of equity" is not a mantra that makes the Bankruptcy Code dissolve. Other innocent creditors have their own claims, which ought not be diminished so that a judge may express sympathy for a group of unfortunates. Judges are not entitled, in or out of bankruptcy, to favor the litigants they think most worthy, as opposed to those who have the best legal position. Many of our cases reject the position that equitable considerations justify alteration of the Code's plan of recovery and distribution. E.g., *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 566 (7th Cir.1986); *In re Iowa R.R.*, 840 F.2d 535, 536 (7th Cir.1988).

Likewise we must reject the invitation to rescind Judge Clevert's order that the recipients of the preferential transfers repay with interest. Doubtless judges have discretion to exercise when deciding whether to award prejudgment interest—more discretion than they possess when deciding whether to avoid a preferential transfer. Discretion is not, however, authorization to decide who deserves the money more. Discretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so. The only reason appellants give why discretion should have been exercised in their favor is that the case has lasted a long time, so interest has mounted; an award now, they say, would be "punitive." This misunderstands why courts award prejudgment interest. Compensation deferred is compensation reduced by the time value of money; if the proceeds had been returned to Milwaukee Cheese's estate and distributed to the creditors, they would have been able to earn interest on it during the last decade. That is why prejudgment interest is an ingredient of full compensation. It is also why an award, no matter how large, cannot be called "punitive": defendants can invest the funds while the litigation proceeds, then use the interest they receive to satisfy the obligation.

Delay is a reason to award interest, not to avoid interest; the longer the case lasts, the more of the stakes the defendant keeps even if it loses (and the less the victorious plaintiff receives), unless interest is added. *Milwaukee v. Cement Division of National Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331–35 (7th Cir.1992). Gratuitous delay by the party seeking the award—delay that injures the other side by forcing it to act as an uncompensated trustee or investment manager—might be a reason to limit an award of interest. See *Cement Division*, 515 U.S. at ——, 115 S.Ct. at 2096. But the delay here is attributable to the judicial branch, and its effect is neutral between the parties. Unfortunate though it is that this case has lasted as long as the *Amoco Cadiz* litigation (which involved litigants from four continents and hundreds of millions of dollars in claims), an award of prejudgment interest still restores the parties to the positions they would have occupied had this case concluded in the 1980s rather than the 1990s.

AFFIRMED.