In re APEX AUTOMOTIVE WARE-HOUSE, L.P., an Illinois limited partnership, and The Whitlock Corporation, a Minnesota corporation, Debtors.

John T. Grigsby, Jr., Trustee for the Apex Automotive Warehouse, L.P. and The Whitlock Corporation Creditor Trust, Plaintiff,

v.

David Carmell, Cedas Realty, Inc., Sammy of Illinois, Inc., and Ellen Carmell, Defendants.

Bankruptcy Nos. 96 B 04594, 96 B 04596. Adversary No. 96 A 01618.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 21, 1999.

Joseph A. Friedman, Kenneth C. Johnston, Kane Russell Coleman & Logan, P.C., Dallas, TX, for Plaintiff.

Gregory J. Jordan, Jordan & Oddo, Chicago, IL, for Defendant.

# FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on four counts [1] of the multi-count First Amended Complaint (the "Complaint") of John T. Grigsby, Jr., Trustee for the Apex Automotive Warehouse, L.P. and the Whitlock Corporation Creditor Trust (the "Trustee") against David Carmell ("Carmell"), Cedas Realty, Inc. ("Cedas"), Sammy of Illinois, Inc. ("Sammy"), and Ellen Carmell ("Ellen"). In Count One, the Trustee seeks recovery of $1,701,406.02 under a promissory note signed by Carmell. In Count Two, the Trustee seeks recovery on an account from defendant Cedas, a corporation of which Carmell is the sole stockholder and director. In Count Seven, the Trustee seeks to avoid the fraudulent transfer of five checks totaling $496,038.12 made by the Whitlock Corporation ("Whitlock") to Carmell and subsequent transfers of the net proceeds of the five checks, $326,073.59, first to Carmell's wife, Ellen, and then to Ellen's wholly-owned corporation, Sammy; and in Count Eight, the Trustee seeks to avoid as preferential the same series of transfers. For the reasons set forth herein, the Court finds in favor of the Trustee on all four Counts.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Local General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). Venue is appropriate in accordance with 28 U.S.C. § 1409(a).

## II. FINDINGS OF FACT

To the extent these findings of fact contain a conclusion of law, it will stand as an additional conclusion of law; if any conclusions of law contain a finding of fact, it will stand as an additional finding of fact.

### A. The Carmell Companies

Carmell owned or controlled several companies simultaneously. Apex, and later, Whitlock, sat at the summit of a pyramid of interconnected corporations and partnerships.

Apex was a limited partnership. Apex Management, Incorporated ("Apex Management") was the general partner and owned 1% of Apex. Cedas was the limited partner and owned 99% of Apex. Cedas was formerly known as Consumers Tire and Supply, Inc. ("Consumers").

Since at least January, 1990, Carmell was the majority shareholder, president, and sole director of both Cedas and Apex Management. Cedas and Apex Management were both "S" corporations.[2] Sometime in July, 1992, Carmell became the sole shareholder of both corporations. From that time forward, Carmell had absolute control of Cedas, Apex Management, and Apex.

Carmell and Daniel Pastron ("Pastron"), Apex's controller, were Apex's officers prior to bankruptcy. Carmell was Apex's sole director.

On January 27 or 28, 1995, Apex acquired the stock of Whitlock from WSR Corporation ("WSR") in a heavily leveraged buyout. Apex borrowed $28,500,000

1. Pursuant to the Trustee's statement in the Pretrial Order, Counts Three, Four, Five, and Nine of the Plaintiff's First Amended Complaint have been dismissed. Due to inadvertent misnumbering, the Complaint contains no Count Six.

2. "Subchapter S of the Internal Revenue Code entitles certain corporations to elect to be taxed almost ... as if they were partnerships. The Subchapter S corporation's profits and losses flow through to the shareholders and are reported on their individual income tax returns, thus avoiding double taxation of corporate earnings." *Cabintaxi Corp. v. Commissioner of Internal Revenue,* 63 F.3d 614, 615 (7th Cir.1995).

through a term loan and revolving loan facility from Greyhound Financial Corporation ("Greyhound"), now known as Finova Financial Corporation ("Finova"), to buy the shares of Whitlock.[3] Apex transferred all its operating assets to Whitlock. Carmell then became Whitlock's president and sole director; Carmell had absolute control over Whitlock.

Sammy was an auto parts retail store located in Palatine, Illinois, doing business under the name of Auto Parts House. Prior to 1994, Auto Parts House was not part of the Carmell companies; Auto Parts House was a customer and account debtor of Apex. In June, 1994, Apex foreclosed on Auto Parts House. Apex bought the personal property of the business at a UCC sale and also bought the real property at a foreclosure sale.

Apex transferred the real property to Cedas as a capital distribution; Cedas then transferred it to Carmell as a capital distribution. Carmell gave the property to Ellen. Ellen was Sammy's sole officer, director, and shareholder, although from her testimony at trial she did not appear to be very knowledgeable about the auto parts business or business matters in general. Auto Parts House, in its Sammy incarnation, remained a customer of Apex. Carmell had access to all of Sammy's books and records.

## B. Bankruptcy Events

Apex and Whitlock (together, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on February 22, 1996. On September 24, 1996, this Court confirmed Debtors' Modified Third Amended Plan of Reorganization (the "Plan"). The Court's September 24, 1996 Order Confirming Debtor's Modified Third Amended Consolidated Plan of Reorganization provides that "the Creditor Trust and the Creditor Trustee possess standing and are appointed as representatives of the Debtors' bankruptcy estates for the

purposes of commencing, prosecuting and receiving the benefits of the Pre–Confirmation Rights of Action and the Carmell Claims."

Article 1.15 of the Plan defines "Carmell Claims" as "any and all claims, rights or causes of action that the Debtors, and each of them, may possess against [David] Carmell, in any capacity, or any transferee of [David] Carmell, as of the Confirmation Date." Article 1.60 of the Plan defines "Pre–Confirmation Rights of Action" as:

all rights, claims and causes of action, whether equitable or legal, of the Debtors against Third Persons (including the right to prosecute or compromise and settle such rights, claims and causes of action) existing before the Confirmation Date, including, without limitation, any Avoidance Action, but excluding (a) claims, rights or causes of action arising in the ordinary course of the Debtor's business, operations and affairs (e.g., accounts receivable, credit for returns, etc.), [and] (c) the Carmell claims.

## C. The Promissory Note

In 1990, an account receivable was created to track business transactions between Apex and Consumers. In 1990, the account shows intercompany inventory transactions between Apex and Consumers.

Neither party made clear at trial when Consumers changed its name to Cedas, but from at least 1991 through January 17, 1995, Apex maintained the account receivable as due from Cedas ("the Due From Cedas"). The Due From Cedas was an intercompany account receivable that was not evidenced by a debt instrument executed by Cedas. The Due From Cedas recorded cash advances, rents, draws, property transfers, cash receipts and a shareholder buyout.

In 1992, when Carmell became Cedas' sole shareholder, Apex's records for the

3. All the assets of both Apex and Whitlock secured the loan.

Due from Cedas show that Apex advanced $1,449,751 for a shareholder buyout. Apex issued checks totaling that amount to several individuals. Apex issued the checks in two batches. It issued the first batch on March 12, 1992 and the second batch on July 24, 1992.

In Apex's 1992 tax return, the Due From Cedas appears in the Federal Statements, on two lines, as an asset worth $1,694,199. The first entry appears in Statement 8, "Other Current Assets," with an opening balance of $443,456 and an ending balance of $204,000. The second entry appears in Statement 9, "Other Assets," with an opening balance of $0 and a closing balance of $1,490,199. Carmell signed Apex's 1992 tax return on April 11, 1993.

By early 1994, Cedas had sold all of its assets except for its interest in Apex. In March or April of 1994, Neal Tyson ("Tyson"), Carmell's cousin as well as the accountant who prepared Apex's annual financial statements and the tax returns for Apex, Cedas, Carmell, and Ellen, reclasssified the Due from Cedas as an account receivable as Due from Executive (the "Due from Executive").

Tyson made this change because Cedas no longer had any assets to support the receivable.[4] Because Cedas no longer had any assets, the Due from Cedas was uncollectible and could not be reported in Apex's financial statements as an asset. According to the Statements on Standards for Accounting and Review Services ("SSARS") published by the American Institute of Certified Public Accountants, assets are "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events." The value of an uncollectible receivable is at best illusory; an uncollectible receivable creates no probable future benefit.

Before making the reclassification, Tyson consulted with Carmell. To continue reporting the Due from Cedas as an asset of Apex, Tyson needed assurance that Cedas had the ability to pay its debt. As Cedas could no longer give that assurance, Tyson offered two options for reporting the Due from Cedas: (1) write the receivable off to equity, thus reducing the value of the partners' (i.e., Carmell's) interests or (2) reclassify the receivable to an obligor who could give assurance that the debt would be paid. Tyson advocated writing the Due from Cedas off to equity but Carmell elected to report it as an asset called Due from Executive in Apex's financial statements.

As assurance that the Due from Executive provided a probable future benefit to Apex, Tyson's firm prepared the Promissory Note ("the Note") at issue in this case. The Note provides:

> FOR VALUE RECEIVED, the undersigned Borrower, (called Borrower), promises to pay to the order of Apex Automotive Warehouse, L.P. (herein after [sic] the Lender), and the Lender's principal place of business in Northlake, Illinois, or such other place as the lender shall designate in writing, the principal sum of One Million Six Hundred and Fifty Thousand Dollars ($1,650,000.00).
>
> 1. This Promissory Note evidences a form of credit financing under which Borrower may borrow funds from time to time pursuant to the Borrower's request, provided that the principal sum outstanding from time to time, shall not exceed in the aggregate One Million Six Hundred and Fifty Thousand ($1,650,000.00) Dollars.

**4.** Apex's December 13, 1993 work papers for the Due from Cedas contain a note written by a member of Tyson's accounting firm stating that "[b]alance is primarily made up of advances by Apex to effect a shareholder buyout in the previous year. As the Building owned by Cedas was sold subsequent to the Balance Sheet this account as well as the Inter Co A/R will be reclassified as due from Executive on the Financial Statements."

2. The Borrower's requests for advances upon its line of credit shall be made in writing to the address for payment hereinafter described.

3. Payments upon the principal balance due hereunder from time shall be made promptly by the Borrower upon demand of the legal holder hereof.

Payments of principal shall be made at such place as the legal holder hereof may from time to time in writing appoint and in the absence of such appointment, at the principal place of business of Apex Automotive Warehouse, L.P.

The undersigned hereby waives presentment for payment, notice of dishonor and protest.

The Note's purpose was to support the Due from Executive amounts on Apex's financial statement. The balance due under the Note was the balance of the Due from Executive account. Carmell drew on the Note's line of credit to become a co-obligor of Cedas' debt to Apex.

Although prepared some time in the spring of 1994, the note bears the date March 12, 1992, the date on which Apex issued the first batch of checks to Cedas' minority shareholders. Carmell read and signed the note. Neither side presented evidence as to when he signed the document but a copy faxed to Tyson by Apex bears the transmission date of April 15, 1994.

Apex's 1993 financial statement does not include a Due from Cedas account but does include the Due from Executive account in the amount of $1,108,437. Note 6 to that financial statement, pertaining to Due from Executive, states in part that "[t]he balance represents advances to the company's chief executive."

The Due from Cedas account does not appear in Apex's 1993 tax returns. However, Statement 7 of the federal statements section of the return lists Due from Executive as an asset with a beginning balance of $1,694,199, the same amount as the prior year's ending balance for Due from Cedas. The ending balance was $1,183,937. Carmell signed Apex's 1993 tax return on April 11, 1994.

Apex's 1994 tax return shows that the Due from Executive had a closing balance of $1,518,385. Carmell signed that return on December 28, 1995.

Pastron, who kept all the records for the Due from Cedas and Due from Executive from November, 1991 through January 26, 1996, prepared a summary of all transactions in the Due from Executive through January 26, 1996. According to that summary, the balance of the Due from Executive was $1,701,406.02 as of January 26, 1996. Included in that figure is Carmell's draw for 1994 income taxes in the amount of $96,038.12. The Trustee seeks to recover this tax draw in his fraudulent transfer and preferential transfer counts but the Trustee cannot recover the tax draw twice. Therefore, the balance of the Due from Executive is $1,605,367.90 ($1,701,406.02–$96,038.12).

## D. The Trustee's Standing to Sue Cedas

Apex was in the business of selling automotive parts and accessories. The advances accounted for under the Due from Cedas and Due from Executive accounts did not arise from the sale of automobile parts and accessories.

Apex was not in the business of lending money. While Apex systematically maintained the Due from Cedas and Due from Executive Accounts in the ordinary course of its business, the transactions recorded therein were transactions outside the ordinary course of Apex's business. Therefore, the provision of the Plan excluding claims that arose in the ordinary course of the Debtors' business from the "Pre–Confirmation Rights of Action" category does not affect the Trustee's claim against Cedas. The Trustee has standing to sue

Cedas on the Due from Cedas and Due from Executive accounts.

### E. The Five Checks

On the morning of January 26, 1996, Carmell caused Whitlock to make a distribution to him in the gross sum of $496,038.12 (the "Distribution"). Carmell instructed Pastron to prepare and issue the Distribution. The Distribution, net of applicable taxes, is evidenced by five checks payable to Carmell in the net amount of $326,073.59 (the "Checks"). One of the Checks, check number 62022, in the amount of $96,038.12, was intended to represent reimbursement for income taxes paid by Carmell for the year ending December 31, 1994 as a result of pass-through income from Apex Management and Cedas (the "Tax Transfer"). Carmell caused the other four checks, totaling $400,000 in gross, to be issued to him as a bonus over and above his annual salary of $130,000.

In previous fiscal years, Apex had issued year-end checks to Carmell. Those year-end checks included both a tax component and an amount above the tax component.

After receiving the Distribution, Carmell gave the checks directly to his wife, Ellen, as a gift. Ellen then endorsed the Checks to her company, Sammy. Sammy delivered the Checks to Whitlock and the Checks were deposited into Whitlock's bank account and paid. The amounts represented by the Checks were credited against Sammy's open account obligations to Whitlock.

In January, 1996, cash at Whitlock was extremely tight and had been tight for several months. It was very difficult for the company to make payroll from week to week. On either January 19, 1996 or January 26, 1996, Whitlock could not make payroll until its lender relented and agreed to fund it.

On December 15, 1995, representatives of Finova and Whitlock held a meeting to discuss Whitlock's financial situation. On December 28, 1995, Whitlock hired a crisis manager, Alliance Capital ("Alliance"), to manage the cash and inventory.

Pastron was holding many checks that he had written but could not send to vendors (the "Held Checks") because issuing the checks would have overdrawn Whitlock's line of credit. Whitlock began slowing vendor payments in September, 1995 and had been holding checks since October, 1995. The Held Checks totaled over $1,200,000 on December 28, 1995. By January 23, 1996, the Held Checks totaled $3,500,000.

Several vendors had cut Whitlock off. Others had placed the company on a Cash on Delivery or Cash in Advance basis. Vendors were asking if they would be paid and if there was any likelihood of getting back their goods and materials. Inventory receipts had slowed down tremendously, resulting in sales reduced by Whitlock's inability to ship goods. A thirteen-week cash flow projection that began with the week ending Friday, January 19, 1996 shows that Whitlock's cash deficit was $8,300,000 on January 26, 1996 and would amount to more than $9,000,000 by mid-April.

The Debtors generally were not paying their debts as they came due.

In December, 1995, Whitlock filed a lawsuit against WSR, seeking damages for alleged discrepancies in Whitlock's balance sheet. Under the heading "Due from Seller," Whitlock's January 26, 1996 balance sheet indicates that the Debtors then valued the litigation at $5,650,000. WSR in turn filed a counterclaim against the Debtors for breach of contract. In Paragraph 21 of its complaint against WSR, Apex stated that "[r]apidly changing circumstances at WSR, according to statements made on September 20, 1995 by WSR's president Luke Beshar to Apex president David Carmell, may soon impair Apex's ability to recover the full (or any) amount

owed to it under the Agreement."[5]

Sometime in January, 1996, but before January 26, 1996, Whitlock engaged Jonathan A. Backman ("Backman"), a partner at the law firm of Gould and Ratner, as bankruptcy counsel. However, Whitlock had not made a final decision about filing a petition in bankruptcy by January 26, 1996. Carmell told Backman that he intended to take the Distribution. Backman told Carmell that, in the event that Whitlock and Apex proceeded with a bankruptcy filing, either the creditors or the companies probably would sue him to recover the Distribution.

**F. The Motion for Summary Judgment**

On April 15, 1997, the Trustee filed a motion for summary judgment on the four counts of the Complaint here at issue. On March 25, 1998, the Court denied the Trustee's motion.

As to Count One of the Complaint, concerning the Note, the Court held that the Note was "a line of credit payable on demand." The Court found, however, that a genuine issue of material fact existed as to the amount, if any, of the principal balance due under the Note.

The Court further held that, as to Count Two, the suit on an account receivable from Cedas, the Trustee could proceed only if the claim fell within the definition of Pre–Confirmation Rights of Action as provided in the Plan. The Court found that an issue of fact existed as to whether the Due from Cedas arose in the ordinary course of business and thus, whether the Trustee had standing to sue Cedas.

The Court denied summary judgment on Count Seven, involving the fraudulent transfer of the Checks, because the Trustee failed to prove a necessary element of his case: that Whitlock was insolvent at the time of the transfer. The Court also

denied summary judgment on Count Eight, the preferential transfer to Carmell, Ellen, and Sammy (collectively, the "Transfer Defendants"), finding, for the purposes of the summary judgment motion, that the Transfer Defendants had rebutted a presumption of insolvency and that a genuine issue of material fact existed as to whether Whitlock was insolvent on January 26, 1996.

**III. DISCUSSION**

At trial, the Trustee presented testimony from several fact witnesses and one expert witness. The Trustee's fact witnesses included Tyson, Pastron, and Backman. Also testifying in the Trustee's case were: (1) Mark Cleary ("Cleary"), a Certified Public Accountant ("CPA") who began working at Whitlock as an independent contractor hired by Alliance and who later joined Whitlock as its Chief Financial Officer; (2) Charles H. Mendeljian ("Mendeljian"), chairman of the unsecured creditors' committee and the director of credit services with Echlin, Incorporated, the Debtors' largest creditor; (3) Daniel E. Griffin ("Griffin"), vice president and general manager with MEMA Financial Services Group, an automotive industry credit reporting agency and a specialist in restructurings, workouts, and rehabilitations of its customers;[6] and (4) Brian Chris Schwartz ("Schwartz"), Whitlock's Chief Executive Officer since February, 1996. The Trustee's expert witness, Scott Peltz ("Peltz"), a CPA and partner at the accounting firm of Altschuler, Melvoin & Glasser, testified about the reasonableness of Tyson's actions relating to the reclassification of the Due from Cedas as Due from Executive and about whether Whitlock was insolvent on January 26, 1996.

The Defendants presented Carmell and his wife, Ellen, as fact witnesses. Marilee

---

5. WSR itself has since filed a petition for relief under Chapter 11 of the Bankruptcy Code.

6. The Trustee presented this testimony by deposition designation pursuant to Federal Rule of Civil Procedure 32, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7032.

Keller Hopkins ("Hopkins"), a CPA and partner at the accounting firm Crowe Chizek & Company, testified as the Defendants' expert witness. Hopkins testified about accounting issues relating to the Due from Cedas and Due from Executive accounts and about Carmell's compensation. Hopkins did not testify about Whitlock's solvency as of January 26, 1996.[7]

The major issues at trial were: (1) how much, if anything, Carmell owes to the Debtors under the Note; (2) whether the Trustee has standing to sue Cedas on the open account and if so, how much money, if any, Cedas owes to the Debtors; (3) whether Whitlock was insolvent on January 26, 1996, when Carmell took the Distribution; (4) whether Whitlock received reasonably equivalent value for the Distribution; and (5) whether Carmell caused Whitlock to make the Distribution to him in the ordinary course of business.

## A. Count One: The Amount Due Under the Note

At trial, the Trustee introduced evidence to establish the balance due under the Note by demonstrating that the Due from Cedas and Due from Executive accounts represented draws under the terms of the Note. This evidence included documents and testimony showing that the Note's purpose was to support those accounts.

Carmell argues that because the Court has concluded that the Note is clear on its face, the parol evidence rule prevented the Trustee from introducing evidence at trial to show how the Note was created or what its purpose was. Carmell further argues that the Note was not tied to the Due from Cedas or Due from Executive accounts. He also argues that the Trustee cannot show that he drew upon the line of credit because the terms of the Note require a written request for a draw. Finally, he argues that there is no money due under the Note because the debt was canceled on January 27, 1995 as part of the Whitlock takeover transaction.

Parol evidence is not admissible to vary, alter, contradict, or amend the terms of an unambiguous agreement. *Betaco v. Cessna Aircraft Co.*, 103 F.3d 1281, 1292 (7th Cir.1996); *Excalibur Automobile Corp. v. Robinson (In re Excalibur Automobile Corp.)*, 859 F.2d 454, 458 (7th Cir. 1988). When a document is unambiguous, or clear on its face, the text contains no indication or warning that the document means anything other than what it says. *AM Int'l, Inc. v. Graphic Mgt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir.1995). A document that is clear on its face contains no patent, or obvious, ambiguity. *Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1162 (7th Cir.1999).

However, the Trustee has argued in the alternative that: (1) the doctrine of extrinsic ambiguity applies in this case or (2) that parol evidence is admissible to establish the balance due under the Note. The Court first will address the question of whether the Note is extrinsically ambiguous.

A document that seems to be clear on its face may contain latent, or extrinsic, ambiguities. *AM Int'l*, 44 F.3d at 574. An agreement's terms are latently, or extrinsically, ambiguous when, after consideration in the light of the context of the agreement's creation, they are susceptible of more than one meaning. *Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir.1998). A party may use extrinsic evidence both to show that an extrinsic ambiguity exists and to demonstrate the true meaning of the ambiguity. *Stone Container*, 165 F.3d at 1162; *see also, Moriarty v. Svec*, 164 F.3d 323, 331 (7th Cir.1998) (explaining that a court looks at extrinsic evidence to determine what meaning the parties attached to an ambiguous term).

Parties may present extrinsic evidence only in limited circumstances.

---

7. Hopkins' testimony was limited to matters contained in her report dated June 27, 1997.

*Mathews,* 144 F.3d at 461. First, the evidence must be objective; objective evidence is that which can be supplied by disinterested third parties. *AM Int'l,* 44 F.3d at 575. Secondly, "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack v. Wheelabrator Corp.,* 993 F.2d 603, 608 (7th Cir.1993).

■ The Trustee has not claimed that any contractual language in the Note is open to more than one interpretation. Nor does the Note suffer from a "yawning void." The Note is plausibly complete as a contract establishing a line of credit with the balance payable on demand and under which Carmell was obligated to make written requests for draws. The doctrine of extrinsic ambiguity does not apply to the Note.

■ However, the Trustee does not need the doctrine of extrinsic ambiguity because the parol evidence rule does not exclude the evidence offered at trial. Parol evidence is admissible to show the consideration for, motivation for, and circumstances surrounding the execution of an agreement. *Dancy v. William J. Howard, Inc.,* 297 F.2d 686, 688 (7th Cir.1961); *Lincoln Nat'l Life Ins. Co. v. Horwich,* 115 F.2d 892, 895–96 (7th Cir.1940); *Cinquegrani v. IRS (In re Cinquegrani),* Nos. 89 B 7850, 89 A 0747, 1993 WL 134752, at *7 (Bankr.N.D.Ill. Feb. 1, 1993). The Trustee did not attempt to change or contradict the terms of the Note. The evidence offered by the Trustee merely establishes the balance due under the Note and the circumstances under which Carmell drew on the line of credit.

The Note provided Carmell with an interest-free line of credit in the amount of $1,650,000. The existence of the Note provided assurance that the Due from Executive account would be repaid. Carmell drew upon that line of credit to support the Due from Executive and to become a co-obligor of Cedas' debt to Apex. The reclassification of the Due from Cedas represented the initial draw under the Note. Carmell, aware of the circumstances and fully understanding them, accepted the co-obligation by signing the Note. What is more, he signed Apex's federal tax returns and issued Apex's financial statements listing the Due from Executive as an asset.

Carmell's agreement to assume liability for the Due from Cedas allowed Apex to keep an asset worth more than one million dollars on its books on a continuing basis. If Carmell had not assumed liability to support the reclassification of the Due from Cedas as Due from Executive, Apex would not have been able to report the receivable as an asset in its financial statements. Apex would have had to report equity reduced by more than one million dollars. Further, without Carmell's assumption of liability, Cedas could not have continued drawing money from Apex, which Pastron's summary sheets and Apex's books clearly show that Cedas did. The testimony of Pastron, Tyson, and Peltz supports this conclusion.

Carmell offered only his own self-serving testimony in factual contradiction. His testimony consisted almost entirely of assertions that Apex's books were simply wrong, supplemented by assertions that he did not read the documents he signed. This testimony lacks credibility, especially in light of the objective evidence provided by the Trustee's documents and witnesses.

Carmell also offered Hopkins' expert opinion that, although the balance of the Due from Executive is $1,605,367.90, Cedas had long ago repaid the shareholder buyout. Hopkins arrived at this conclusion by applying credits to the account on a first-in, first-out basis. Even were the Court to find this implausible explanation credible, it still would be irrelevant. Carmell did not assume liability for the shareholder buyout; he assumed liability for the

Due from Cedas and Due from Executive accounts.

Hopkins further opined that the Due from Cedas and Due from Executive accounts were canceled pursuant to paragraphs 9.5 and 10.5 [8] of the Stock Purchase Agreement Between Apex Automotive Warehouse, L.P. and WSR Corporation Relating to the Sale of All of the Outstanding Capital Stock of the Whitlock Corporation (the "Stock Purchase Agreement"). However, the Stock Purchase Agreement cancels only those intercompany debts owed between WSR and Whitlock. The Stock Purchase Agreement makes no reference to, and has no effect upon, debts owed between Carmell, Cedas, and Apex.

The fact that Carmell never made written requests for draws on the line of credit is also irrelevant. As the person in sole and absolute control of Apex, Carmell needed nobody's permission to take advances.

The Due from Executive represents the balance due under the Note. Carmell is liable for the $1,605,367.90 balance of the Due from Executive account.

## B. Count Two: Recovery from Cedas

The Court has reviewed the evidence pertaining to the nature of Apex's business and found that the transactions recorded in the Due from Cedas were not transactions in the ordinary course of Apex's business. Thus, the Court concludes that the claim in Count Two of the Complaint is a Pre–Confirmation Right of Action as described in the Plan. The Trustee has standing to bring suit against Cedas.

Cedas' defenses to the claim in Count Two are that Apex's books are wrong and that the Due from Cedas was canceled by the Stock Purchase Agreement. In support of these defenses, Cedas offered only the testimony of Carmell and Hopkins, which the Court found unconvincing in Count One and also finds unconvincing in Count Two.

The balance of the Due from Executive is the balance of the Due from Cedas. Cedas is liable for the $1,605,367.90 balance of the account.

## C. Count Seven: Avoidance of Fraudulent Transfers

The Trustee seeks to avoid and recover the Distribution in the amount of $496,038.12 made by Whitlock to Carmell twenty-seven days before Whitlock's bankruptcy filing. The Trustee also seeks to avoid and recover the subsequent transfers of the net proceeds of the Distribution to Ellen and Sammy.

A trustee in bankruptcy may avoid a transfer "of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1). The Trustee thus seeks to avoid the transfer of the Distribution under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/1 et seq. Section 6 of the IUFTA provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer

---

8. The language of each paragraph is identical. Each paragraph states that:

 *Intercompany Indebtedness.* All liabilities reflected in the Intercompany Account Balance shall, in lieu of repayment, be canceled and (i) if the Intercompany Account Balance is owed by the Company, be treated as a capital contribution to the Company or (ii) if the Intercompany Account Balance is owed to the Company, be treated as a withdrawal of capital. All notes representing liabilities included in the Intercompany Account Balance shall have been canceled without recourse to the Company.

 The Stock Purchase Agreement defines the term "Company" as Whitlock and the term "Intercompany Account Balance" as the net balance of all intercompany accounts between WSR or its affiliates and Whitlock.

or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILCS 160/6.

The parties agree that the Distribution was a transfer of the Debtors' interest in property and that Carmell's claim arose before Whitlock made the transfer. As officer, director, and sole shareholder of Whitlock, Carmell is an insider. The issues at trial were whether the Debtors received reasonably equivalent value in exchange for the Distribution and whether Whitlock was insolvent on January 26, 1996, the date of the transfer.

### 1. The Debtors Were Insolvent at the Time of the Distribution

The IUFTA provides that a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. 740 ILCS 160/3(a). A debtor who generally is not paying its debts on time is presumed to be insolvent. 740 ILCS 160/3(b). Under the Federal Rules of Evidence, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301.

The Trustee presented a great deal of affirmative evidence that the debtors generally were not paying their debts as they came due. Pastron and Cleary testified that the Held Checks in Pastron's cabinet totaled $3,500,000 three days before Carmell took the Distribution. Carmell himself admitted that the Held Checks totaled $3,400,000. Pastron, Cleary, Mendeljian, and Griffin all testified that vendors and suppliers had either stopped making deliveries because of nonpayment or had placed the Debtors on Cash on Delivery or Cash in Advance status. Thus, the Trustee met the requirements of IUFTA § 3(b) and raised the presumption that the Debtors were insolvent on January 26, 1996.

In an attempt at rebuttal, Carmell once again offered his own self-serving testimony that the Debtors' books did not really mean what they seemed to mean. Especially in light of the testimony offered by the Trustee, Carmell's testimony was not credible. Carmell further testified, backed by Hopkins, that, despite all the objective evidence to the contrary, the Debtors were solvent because Carmell valued the litigation against WSR at $12,000,000. The Debtors' books indicate that they valued the litigation at $5,650,000 on January 26, 1996.

However, even if the Court were to accept Carmell's $12,000,000 estimate as accurate, Carmell has still failed to rebut the presumption of insolvency raised by the Trustee. Contingent assets and liabilities must be reduced to their present value for the purpose of determining whether a debtor is insolvent. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988); *In re Ball,* 201 B.R. 204, 208 (Bankr.N.D.Ill.1996). To determine the present value of a contingent liability, a court must first assess the likelihood that the contingency will ever come to pass. *Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d 657, 659 (7th Cir.1992).

The WSR litigation was a contingent asset. On January 26, 1996, the Debtors had no certainty that they would win a suit against WSR, of how much they could recover, or if and when they would be able to collect. Rather, the Debtors were

clearly in great doubt that they would be able to collect anything from WSR and expressed their doubts in the language of their complaint against WSR. In that complaint, the Debtors asked the court to take speedy action because they feared that their ability to collect anything at all would soon be impaired. *See supra,* p. 764.

Carmell offered virtually no evidence to assist the Court in setting a present value for the litigation against WSR. Carmell testified that WSR made a settlement offer of $3,000,000, but conveniently forgot that WSR had cross-claimed damages for breach of contract against Apex. The Trustee, on the other hand, presented evidence that the lawsuit was only a few weeks old, that the claims were contested, and that the Debtors doubted WSR's ability to pay any judgment.

The Trustee has offered Peltz's expert testimony that the present value of the WSR litigation on January 26, 1996 was $2,700,000. Because Carmell has not offered any credible evidence to establish the present value of the litigation, the Trustee has carried the burden of proof.

However, even if the Court were to generously estimate that on January 26, 1996, the Debtors' chances of prevailing against WSR and actually collecting on their judgment were 50%, the WSR litigation would have at best a present value of only $6,000,000. Hopkins testified that the $12,000,000 claimed from WSR, added to the value of the Debtors' assets, gave the Debtors a positive net asset balance of $2,000,000. Therefore, using the $12,000,000 figure reduced to a present value of $6,000,000 shows that, by the testimony of Carmell's own expert, the Debtors were insolvent by $4,000,000. Carmell has failed to rebut the presumption of insolvency.

Although the Trustee was entitled to rely on the unrebutted presumption of insolvency, he also established that the Debtors were actually insolvent under IUFTA § 3(a) by showing that the Debtors's debts were greater than their assets at fair valuation. Peltz testified that, on a liquidation basis, the Debtors were insolvent by more than $25,000,000. He further testified that even on a going concern basis, the Debtors were insolvent by more than $8,000,000. Carmell offered no evidence in support of solvency other than what the Court has already rejected.

The Debtors were insolvent on January 26, 1996. Furthermore, Carmell, in his position of control over the Debtors, had reason to know that the Debtors were insolvent.

### 2. Whether the Debtors Received Reasonably Equivalent Value from Carmell

The Distribution had two components: a check in the amount of $96,038.12 to cover pass-through taxes resulting from the "S" corporation status of Cedas and Apex Management and the $400,000 bonus Carmell ordered Whitlock to pay to him. The question under the IUFTA is whether Whitlock received reasonably equivalent value for all or part of the Distribution.

The IUFTA is an Illinois statute and should be applied according to Illinois law. *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),* 139 F.3d 574, 577 (7th Cir.1998). Although there is very little Illinois case law discussing the term "reasonably equivalent value," the Illinois Supreme Court, in discussing a prior statute, has stated that one of three elements necessary to establish a fraudulent conveyance is that "there must be a transfer made for no or inadequate consideration." *T.J. Gendron v. Chicago & Northwestern Trans. Co.,* 139 Ill.2d 422, 151 Ill.Dec. 545, 564 N.E.2d 1207, 1215 (1990). The Illinois Appellate Court has since implied that there is no reasonably equivalent value when there is "no or inadequate consideration." *Regan v. Ivanelli,* 246 Ill. App.3d 798, 187 Ill.Dec. 351, 617 N.E.2d 808, 814 (1993); *see also, Image Worldwide,* 139 F.3d at 574 (discussing Illinois

interpretation of "reasonably equivalent value").

■ Further, the IUFTA is a uniform act and it derived the term "reasonably equivalent value" from § 548 of the Bankruptcy Code. *Image Worldwide*, 139 F.3d at 574. The Court may thus consider interpretations of the term in cases involving § 548 as well as those under Illinois law. *Id.*

■ The Code does not define the term "reasonably equivalent." Nor is there any fixed mathematical formula to determine reasonably equivalent value for purposes of § 548. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 386 (7th Cir.1997). The Court must consider all the facts of the case and consider factors such as: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*

■ The first step in determining whether the values exchanged were reasonably equivalent is to determine whether the debtor received any value at all. *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3rd Cir. 1996). For purposes of § 548, "value" is "property, or satisfaction or securing of a ... debt of the debtor." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535–36, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) quoting 11 U.S.C. § 548(d)(2)(A). When the debtor exchanges cash for intangibles, such as personal services, the service provider must confer a palpable benefit upon the debtor. *Mellon Bank*, 92 F.3d at 149.

■ Whitlock did not receive any value for the $96,038.12 it paid to Carmell as reimbursement for pass-through taxes on Cedas and Apex Management. Whitlock gained no palpable benefit from that transaction. Only Carmell received benefits.

■ Nor did Whitlock receive value for the $400,000 bonus it paid to Carmell. Carmell testified on his own behalf that he brought a "tremendous amount of value" to Whitlock. However, this testimony was self-serving and the Court does not accept his own valuation of his services. The fact remains that he, the person in absolute control of Whitlock, awarded himself a handsome bonus from a company that, under his leadership, became unable even to pay its bills for the goods in which it traded and shortly thereafter entered bankruptcy. *See Campbell v. Macartie (In re Factory Tire Distributors, Inc.)*, 64 B.R. 335, 339 (Bankr.W.D.Pa.1986) (explaining that "a bonus is normally offered for exemplary performance of one's duties" and finding that a bonus awarded to the debtor's principal shortly before a bankruptcy filing was nothing but a "raid on the corporate treasury.") *Id.* Carmell conferred no palpable benefit on Whitlock.

The transfer of the Distribution is avoidable under IUFTA § 6. The Distribution was to or for the benefit of Carmell. Accordingly, the Trustee is entitled to recover the entire value of the Distribution from Carmell pursuant to 11 U.S.C. § 550.

■ Ellen was Carmell's immediate transferee. While she and Carmell stood in Carmell's office, Carmell endorsed the Five Checks over to her and she endorsed them in turn. She has admitted that at the time of the transfer, she was aware of the Debtors' financial condition, stipulated that she received the checks as a gift, and admitted that she did not act in good faith. Therefore, the transfer was not *bona fide*. Accordingly, the Trustee is entitled to recover the $326,073.59 portion of the Distribution actually transferred to Ellen.

Still standing in Carmell's office, Ellen endorsed the Five checks over to Sammy. Sammy tendered the checks back to Whitlock as payment in full on its account. Through Ellen, Sammy was Carmell's mediate transferee. Accordingly, the Trustee is entitled to recover the $326,073.59 por-

tion of the Distribution actually transferred to it.

### D. Count Eight: Avoidance of Preferential Transfers

 The transfer of the Distribution is also preferential under 11 U.S.C. § 547(b). "Section 547 is designed to discourage (by eliminating the fruits of) a race immediately before bankruptcy to get all of one's own debt repaid, and let the devil take the hindmost...." *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 847 (7th Cir.1997). Under § 547(b):

> [T]he trustee may avoid any transfer of an interest of the debtor in property-
>
> (1) to or for the benefit of a creditor;
>
> (2) for or an account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made on or within 90 days before the date of the filing of the petition....
>
> (5) that enables such creditor to receive more than such creditor would receive if-
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Pursuant to § 547(f), a debtor is presumed to have been insolvent "on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

The parties do not dispute that the Distribution was a transfer of Whitlock's property, made to or for Carmell's benefit, on account of antecedent debts and within 90 days of the filing of the Debtors' bankruptcy petition. As in Count Seven, discussed above, Carmell disputes that Whitlock was insolvent. He also disputes that he received more than he would have if the

Debtors liquidated under Chapter 7. He further argues that Whitlock made the Distribution in the ordinary course of business and that the Distribution is thus unavoidable pursuant to § 547(c).

The Court has already discussed the question of Whitlock's insolvency and determined both that the Transfer Defendants failed to rebut the presumption of insolvency and that the Trustee had established Whitlock's insolvency by a preponderance of the evidence. Whitlock was insolvent at the time of the Distribution.

The Debtors discharged more than $20,-000,000 of unsecured debt in their Chapter 11 case. The Court may reasonably infer that Carmell would not have received a 100% distribution from a Chapter 7 proceeding.

Therefore, all the elements of a preferential transfer under § 547(b) have been established. The Trustee may avoid and recover the Distribution unless Carmell can show that Whitlock made the Distribution in the ordinary course of business as defined in § 547(c)(2). A transfer in the ordinary course of business defense under § 547(c)(2) must be:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms....

11 U.S.C. § 547(c)(2).

 This exception to preferential transfer avoidance applies only in routine or regular circumstances that create little or no risk of setting off a pre-bankruptcy race for the debtor's assets. *Milwaukee Cheese*, 112 F.3d at 848. The exception protects "recurring customary credit transactions that are received and paid in the ordinary course of the business of the debtor and the debtor's transferee." *Mid-*

*way*, 69 F.3d at 797 quoting *Energy Coop., Inc. v. SOCAP Int'l, Ltd.*, 832 F.2d 997, 1004 (7th Cir.1987) quoting 4 L. King, Collier on Bankruptcy, ¶ 547.10. To claim the protection of this section, the creditor must prove, by a preponderance of the evidence, that the transaction was ordinary as between the parties and ordinary in the industry examined as a whole. *In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir.1995).

■■■ Carmell offered evidence that Apex reimbursed him annually for the pass-through taxes on Cedas and Apex Management. He offered no evidence that this practice was ordinary in the auto parts business as a whole. He has not carried his burden of proof and has not established that Whitlock made the tax transfer of $96,038.12 in the ordinary course of business under § 547(c)(2). Carmell also testified on his own behalf that it had been his practice yearly to take a large sum in addition to his annual salary. He presented no evidence that this practice was according to a plan or written company policy; the practice seemed to be carried out informally, at Carmell's whim. Pastron testified that Carmell took a yearly payment that included the pass through taxes and some amount over. Carmell and Hopkins each testified that Carmell benchmarked his compensation level with those of executives of other companies within the industry, but the companies with which they benchmarked were clearly much larger and more profitable than Whitlock. For instance, Carmell testified that he benchmarked with one company, Hahn Automotive, because it was where "we felt we were planning to go." Carmell testified that Hahn's senior executive received roughly $450,000 per year in compensation and that his son received "approximately $300,000 a year in salary." Neither Carmell nor Hopkins testified about the bonus practices or programs in the benchmark companies or under what circumstances, if any, those companies awarded bonuses.

A bonus by its very nature is something out of the ordinary. "Typically, a bonus is a reward, a premium paid for extraordinary work; it is not ... 'guaranteed additional compensation' regardless of whether [the] employer earns income." *Stat v. Avenue Group, Inc.*, 743 F.Supp. 569, 573 (N.D.Ill.1990). "[A] bonus is a merit award, and not salary." *Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F.Supp. 667, 679 (S.D.N.Y.1995). A bonus is "that amount paid over what is required." *Rabinovitz v. Pena*, 905 F.Supp. 522, 534 (N.D.Ill.1995). A bonus is a "consideration or premium paid in addition to what is strictly due." *Spectacor Mgt. Group v. Brown*, No. 93–5246, 1996 WL 571808, at * 10 (E.D.Pa.1996, Sept. 27, 1996) quoting BLACK'S LAW DICTIONARY 182 (6th ed.1990).

Even assuming, *arguendo*, that it was the Debtors' regular practice to award large bonuses to Carmell regardless of their financial position, Carmell presented no evidence about the bonus practices in the auto parts industry. He certainly presented no evidence that it was regular, customary, or routine in the industry for the sole controlling individual to issue himself a $400,000 bonus at a time when the company was unable even to pay its suppliers. Rather, his conduct in awarding himself such a bonus at such a time and subsequently using that bonus to wipe out a large account owed to the Debtors by the company he gave to his wife is exactly the type of self-serving conduct that § 547 was intended to circumvent.

The Trustee may avoid the transfer of the Distribution to Carmell under § 547 and may recover $496,038.12 under § 550. The Trustee may also avoid and recover the subsequent transfers to Ellen and to Sammy in the amount of $326,073.59.

## IV. CONCLUSION

For the foregoing reasons, judgment in the amount of $1,605,367.90 shall be entered in favor of the Trustee and against Carmell on Count One. Judgment in the amount of $1,605,367.90 shall be entered in

favor of the Trustee and against Cedas on Count Two. Judgment in the amount of $496,038.12 shall be entered in favor of the Trustee and against Carmell on Counts Seven and Eight. Judgment in the amount of $326,073.59 shall be entered against Ellen and Sammy on Counts Seven and Eight.